[No. A120576. First Dist., Div. Three. Sept. 30, 2008.]

SN SANDS CORPORATION, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

## COUNSEL

Rogers Joseph O'Donnell, Neil H. O'Donnell, Aaron P. Silberman and Michelle L. Baker for Defendant and Appellant.

Dennis J. Herrera, Wayne Snodgrass and Vince Chhabria for Plaintiff and Respondent.

## OPINION

**POLLAK, J.**—SN Sands Corporation doing business as S&S Trucking (S&S) challenges the jurisdiction of the Board of Supervisors (the board) of the City and County of San Francisco (the city) to disapprove the entry of a contract by the city's public utilities commission (PUC) that was conditionally awarded to S&S through a competitive bidding process. The board's jurisdiction is governed by a provision of the city charter requiring the board to approve contracts with "anticipated expenditures" of $10 million or more. The parties disagree about the proper interpretation of this provision where,

as here, the contract is not for a fixed dollar amount, and they dispute whether the anticipated expenses under the proposed contract with S&S meet the $10 million threshold. We agree with S&S and the trial court that the anticipated cost of a proposed contract must be based on probable expenditures for which there is evidentiary support, and that the board assumed jurisdiction in this case without any such support and contrary to the only evidence that was before it. Moreover, as the trial court also concluded, the additional evidence presented by the city also fails to show that the expenditures to be anticipated over the term of the contract will equal or exceed $10 million. Therefore, we shall affirm the trial court order directing the city to award the contract to S&S.

## Background

*The Charter*

■ The authority of the city to contract for services is governed by its charter. In general, the office of contract administration (OCA) under the supervision of the city administrator is authorized to "[a]ward contracts without interference from the Mayor or Board of Supervisors." (S.F. Charter, art. III, § 3.104; see also S.F. Charter, art. II, § 2.114 ["Neither the [board], its committees, nor any of its members, shall have any power or authority, nor shall they dictate, suggest or interfere with respect to any . . . contract or requisition for purchase or other administrative actions or recommendations of the City Administrator or of department heads under the City Administrator or under the respective boards and commissions."].) However, a contract extending more than 10 years or "requiring anticipated expenditures" by the city of $10 million is subject to approval of the board. (S.F. Charter, art. IX, § 9.118, subd. (b) (section 9.118).)[1] Accordingly, prior to awarding any contract, the OCA must determine whether the anticipated expenditures under the contract are $10 million or more and if so, submit a resolution to the board for approval of the contract. When a contract is submitted to the board for approval, the board must independently determine the anticipated expenditures under the contract and act on the resolution only if it determines that the contract expenses are anticipated to equal or exceed $10 million. (Cf. *Peery v. Superior Court* (1985) 174 Cal.App.3d 1085, 1095 [219 Cal.Rptr. 882] ["the issue of subject matter jurisdiction is impliedly determined in every proceeding, in that the court rendering a decree must pass on and determine its own jurisdiction to do so"].)

---

[1] Section 9.118, subdivision (b) states: "Unless otherwise provided for in this [c]harter, and with the exception of construction contracts entered into by the [city], any other contracts or agreements entered into by a department, board or commission having a term in excess of ten years, or requiring anticipated expenditures by the [city] of ten million dollars . . . shall be subject to approval of the [board] by resolution."

*History of the Proposed Contract*

In February 2007, the OCA issued on behalf of the PUC an invitation for bids for a five-year contract to haul biosolids and grit from the city's wastewater treatment plants to locations outside of San Francisco.[2] The bids were to be submitted based on the rate the bidder would charge per mile traveled to haul the biosolids and grit. S&S submitted the lowest responsive bid at $3.14 per mile for grit and $3.32 per mile for biosolids, subject to an adjustment for increased fuel costs. In addition, bridge tolls were to be billed separately to the city. S&S was conditionally awarded the contract.

In June 2007, the OCA requested that Natalie Sierra, the PUC process engineer responsible for managing the contract, prepare an estimate of the value of the potential contract, and Sierra estimated that expenditures under the contract would be approximately $8.32 million. This estimate was calculated by multiplying the per mile charges in S&S's bid by the number of miles traveled during the previous year by the trucking company then performing the hauling for the city. In a declaration subsequently submitted in opposition to the writ petition, Sierra stated that when she submitted the estimate she explained to the OCA that she "made use of the only reliable information available at the time" but because of the structure of the proposed bid "any estimate of the cost of the potential contract was, by definition, extremely rough." When she submitted her estimate she "made clear" that her projection "was subject to so many variables that it was likely to deviate significantly from the actual amount the city would ultimately be required to pay under the contract." She identified six variables that "rendered the projection unreliable." She noted that the cost of fuel was expected to increase, and that bridge tolls had not been included in her estimate. Three of the identified variables related to the possible relocation of landfill sites and would affect the distance S&S would travel to deliver the waste, potentially increasing the mileage beyond that traveled in 2006. Finally, Sierra noted that the contract would be subject to an upward adjustment in the cost of fuel if S&S transitioned to an alternative fuel. Based on this information, Ben Kawamura, the supervising purchaser in the OCA responsible for the contract, determined that there was a "significant possibility [that] the contract would exceed $10 million over the five-year term" so that board approval was required.

On October 1, 2007, the OCA submitted to the board a proposed resolution approving the contract. The proposed resolution included a finding that "the

---

[2] The contract will also provide for two 2-year optional extensions. However, since the extensions require the approval of both parties, the estimated expenditures during the option periods properly were excluded from the calculation of the expenses to be anticipated by approval of the contract.

contract is anticipated to be in excess of $10 million." The city's budget analyst, however, estimated that the value of the initial five-year term of the contract was approximately $8.58 million. In his report to the board recommending approval of the contract, the budget analyst explained that he relied on the PUC estimate but increased the cost of the contract by 1.5 percent per year for the initial five-year term based on actual increases in California diesel fuel prices over the past year. The report stated that "[t]he only rate adjustments permitted during the initial five-year period would be due to diesel fuel price fluctuations." The record before us contains no indication that S&S challenged the board's jurisdiction to approve or disapprove the contract[3] or that any information regarding the six variables identified by Sierra was submitted to the board. On November 13, the board followed the recommendation of its budget and finance committee and voted not to adopt the proposed resolution. Based on the board's refusal to approve the contract, the city refused to execute the contract with S&S. The PUC informed S&S that it would instead extend its contract with the existing trucking company to perform the services that would have been provided by S&S under the new contract.

On November 20, S&S filed a petition for a writ of mandamus in the San Francisco Superior Court. The petition alleges that the city had a ministerial duty to execute the contract with S&S and that the city violated that duty by failing to award it the contract. The petition alleges that the board has a legal duty not to interfere with the PUC's "award, execution and procession of the contract" and that the board "is not authorized, under the city charter, to approve or disapprove SFPUC contracts having a term of ten years or less and requiring anticipated expenditures of less that $10 million. Since the contract term is five years and the anticipated expenditures under the contract are less than $8.6 million, the board's disapproval of the contract was unauthorized interference with the SFPUC's ability to contract." The petition requested an order vacating the board's resolution disapproving the contract and directing the PUC to execute and proceed with the contract. In opposition, the city submitted declarations by Sierra and Kawamura describing the variables they thought could increase the ultimate cost under the contract and stating OCA's "belief that there was a significant possibility the contract would exceed $10 million over the five-year term." The city also submitted a declaration tending to show that the submission of the contract to the board for approval was consistent with its practice in other cases when there was

---

[3] The record contains a letter, dated November 12, 2007, from S&S's attorney to the board, explaining that S&S had not appeared at the meeting of the board's budget and finance committee on November 7, 2007, because it had not been aware the committee was to consider approval of the contract at that meeting. The letter responded to numerous arguments against approval that had been made at the meeting in its absence, but said nothing on the subject of the board's jurisdiction.

uncertainty as to the amount of expenditures that ultimately would be required under a proposed contract.

Following a hearing on December 13, the court granted the petition. The court rejected the city's argument "that the charter phrase 'requiring antici- pated expenditures . . . of ten million dollars' should be read to mean 'a significant possibility,' " deeming this interpretation to "ignore[] the very clear delineation the charter makes and the restrictions the voters have chosen to place on the authority of the [b]oard to approve contracts." The court stated that the variables that the city contended might increase the costs under the contract "existed at the time of the budget analyst's report and that report, made on the eve of the board's consideration, is far and away the best evidence of the 'reasonably anticipated expenditures' of this contract." The court held that the board lacked the authority to approve or reject the contract, that the PUC had sole authority to award the contract, and that the PUC was obligated to discharge its ministerial duty to award the contract to S&S. The city filed a timely notice of appeal.

## Discussion

"A public entity's ' "award of a contract, and all of the acts leading up to the award, are legislative in character." ' " (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1253 [15 Cal.Rptr.3d 344].) Judicial review of a quasi-legislative decision under Code of Civil Procedure section 1085 " 'is limited to an examination of the proceedings before the agency to determine whether its actions have been arbitrary or capricious, entirely lacking in evidentiary support, or whether it failed to follow proper procedures or failed to give notice as required by law.' " (*Boydston v. Napa Sanitation Dist.* (1990) 222 Cal.App.3d 1362, 1369 [272 Cal.Rptr. 458]; see *Marshall, supra,* at p. 1253.) "This generally means that a court cannot disturb the agency's decision if substantial evidence in the administrative record supports the decision. [Citations.] A court's review is limited to evidence in the administrative record. [Citations.] A court reviewing a quasi-legislative act cannot reweigh the evidence or substitute its own judgment for that of the agency. [Citation.] This deferential standard of review reflects 'deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority.' [Citation.] . . . [¶] On appeal, we independently review the agency's decision and apply the same standard of review that governs the superior court." (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1406–1407 [22 Cal.Rptr.3d 393], fn. omitted.)

■ S&S contends that the board exceeded its jurisdiction and thus abused its discretion by interfering with the award of the contract. "An administrative agency has the power to determine its own jurisdiction in the first instance, before judicial relief may be obtained. When the jurisdiction depends on the existence of certain facts, the agency may determine whether or not those facts exist." (2 Cal.Jur.3d (2007) Administrative Law, § 446, p. 514, fns. omitted; see *United States v. Superior Court* (1941) 19 Cal.2d 189, 195 [120 P.2d 26] ["it lies within the power of the administrative agency to determine in the first instance, and before judicial relief may be obtained, whether a given controversy falls within the statutory grant of jurisdiction . . ."]; *Bennett v. Borden, Inc.* (1976) 56 Cal.App.3d 706, 709–710 [128 Cal.Rptr. 627] ["Before judicial relief may be obtained, the administrative agency has power to determine whether a given controversy falls within its statutory jurisdiction."].) As set forth above, the board's jurisdiction here depends on whether the anticipated expenses under the contract are $10 million or more. Because the jurisdictional issue was not raised when the resolution seeking approval was being considered, the board did not expressly consider its jurisdiction. It relied on the unchallenged determination by the OCA that the contract expenses were anticipated to exceed $10 million. As a result, neither the factual basis for the $10 million estimate nor the applicable legal standard was explored at the hearing. In its reply brief to this court, the city for the first time suggests that S&S waived its jurisdictional objection by failing to raise the issue before the board. The city itself may have waived the waiver contention by failing to raise it earlier in this court (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432]), but in all events the issue goes to the board's jurisdiction and therefore is not subject to waiver (*Troy Gold Industries, Ltd. v. Occupational Safety & Health Appeals Bd.* (1986) 187 Cal.App.3d 379, 385, fn. 3 [231 Cal.Rptr. 861]). We thus review the board's implicit finding based on the limited record before it that it had jurisdiction to reject the contract with S&S.

■ The city argues that the phrase "requiring anticipated expenses of $10 million dollars" in section 9.118 means that board approval of a contract is required if, as Kawamura interpreted the phrase, there is "a significant possibility" that the costs will be $10 million or more. S&S responds that the charter provision requires "something more than merely 'possible' expenditures; it means expenditures the city believes a contract will or probably will require it to make." In interpreting this provision, we employ well-established rules of charter construction: "First, we construe the charter in the same manner as we would a statute. [Citations.] Our sole objective is to ascertain and effectuate legislative intent. [Citation.] We look first to the language of the charter, giving effect to its plain meaning. [Citation.] Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history."

(*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171–172 [36 Cal.Rptr.2d 521, 885 P.2d 934].)

█ While a certain degree of flexibility in determining the anticipated expenditures under a contract for services is necessary when the services are not procured for a fixed price, we agree with the trial court that the determination of the "anticipated expenditures" must be based on more than the mere possibility of incurring an expenditure. Dictionaries define "anticipated" as meaning "to look forward to as certain" (<http://www.merriam-webster.com> [as of Sept. 30, 2008]) and "[a]pprehended beforehand, looked for, expected" (<www.oed.com> [as of Sept. 30, 2008]). "The plain and ordinary meaning of 'expect,' as reflected in dictionary definitions, is to anticipate, to consider probable or certain." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 69 [52 Cal.Rptr.2d 690]; see also *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 746 [15 Cal.Rptr.2d 815] ["expected," as used in the language of insurance policies, means anticipation with a high degree of probability, no matter whether the degree of that probability is expressed as "substantially certain, practically certain, highly likely, or highly probable"].) The board's jurisdiction to approve a purchase contract must be based on a good faith substantiated estimate of expenditures that will be incurred under the contract that are foreseeable and reasonably to be expected when the matter comes before the board.[4]

Considering the evidence that was before the board when it disapproved this contract, it is clear that there is no substantial evidence to support the board's implicit jurisdictional finding that the anticipated expenses under the

---

[4] As mentioned above, the city submitted a declaration by Bill Jones, the assistant director of purchasing for the OCA, which stated that "OCA's current approach to the implementation of section 9.118 of the San Francisco charter is to submit contracts to the board . . . if there is a reasonable possibility that the contract will require the city to expend more than $10 million." He explained that in the past, when the OCA had requested approval from the board for contract amendments to raise the dollar ceiling of contracts from below $10 million to above $10 million, members of the board expressed concerns that the original contracts had not been submitted for approval. He opined that this practice was problematic because "[f]ailure by a department to submit an uncertain contract to the board up front, only to seek the board approval of an amendment later, has the potential to leave the board with two undesirable choices: (1) approve the amendment, thereby retroactively authorizing a $10 million contract without initially having been given the opportunity to consider any potential problems with the contract or any alternatives that might have been available; or (2) reject the amendment, thereby potentially preventing the city from obtaining the full services it contracted to receive . . . ." Thus, the OCA adopted a policy that is intended "to resolve doubts about the need for the board approval by submitting such contracts to the board up front." However, regardless of the degree of uncertainty that may prompt the OCA to advise the board of a contract it proposes to enter, ultimately it is the board that must determine that the jurisdictional threshold prescribed in the charter has been met before purporting to approve or disapprove the contract.

contract equaled or exceeded $10 million. The only evidence before the board was the budget analyst's report, which estimated the cost of the contract to be less than $8.6 million. To the extent that the Kawamura and Sierra declarations filed in the trial court contradict this estimate, that evidence was not presented to or considered by the board. Therefore, it cannot be considered in these writ proceedings to determine whether substantial evidence supports the board's finding. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)[5]

We may consider that evidence, however, to determine the form of relief that is appropriate. Because an incorrect standard was applied to determine whether the anticipated expenses under the contract are at least $10 million, remand to the board ordinarily would be appropriate to allow the board to determine this issue under the proper standard. (*Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1412 [52 Cal.Rptr.2d 395] [where board abused its discretion by applying wrong standard in deciding to reject plaintiff's bid, the award of the contract to second lowest bidder must be set aside and plaintiff's bid must be reevaluated in light of the proper criteria].) However, although remand is customary, such prolongation of the process is not necessary "in the rare case where as a matter of law no evidence could support the agency's decision." (*Carlton v. Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428, 1434 [250 Cal.Rptr. 809]; see *Ross Gen. Hosp., Inc. v. Lackner* (1978) 83 Cal.App.3d 346, 354 [147 Cal.Rptr. 801].) Such is the case here.

The trial court correctly observed that the evidence included in the Sierra and Kawamura declarations, upon which the city relies to establish the board's jurisdiction, does not establish probable expenditures of at least $10 million. The PUC estimated the contract expenditures at approximately $8.32

---

[5] Generally, extra-record evidence is not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions. (*Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at p. 576.) Extra-record evidence is admissible, however, in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute. (*Ibid.*) In *Western States Petroleum Assn.*, the court explained that while "the administrative record developed during the quasi-legislative process is usually adequate to allow the courts to review the decision without recourse to such evidence," extra-record evidence may be necessary "when the courts are asked to review ministerial or informal administrative actions . . . because there is often little or no administrative record in such cases." (*Id.* at p. 575.) Thus, while the declarations might properly be considered in determining whether the OCA abused its discretion in submitting the contract to the board for approval, S&S has expressly disavowed any challenge to that decision. Indeed, in its brief on appeal, S&S states that while the OCA's decision to submit the contract to the board "is relevant background information, it was not at issue below, and is not at issue in this appeal. Put another way, it was not the [OCA's] decision to submit the contract to the board that violated the charter, rather, it was the board's decision to disapprove the contract, despite the undisputed evidence before the board that the contract did not require anticipated expenditure of $10 million."

million. Sierra explained that she did not include the cost of bridge tolls or probable increased fuel costs in her calculations. Both of these unquestionably are anticipated expenses within the meaning of section 9.118. She estimated those additional costs at approximately $369,000 and $334,000 respectively. In addition, Sierra indicated in her declaration that after her estimate was prepared, the PUC entered into new contracts for the placement of the waste that increase the hauling distance and result in increased costs of $435,000. Thus, as of December 2007, when her declaration was filed, the anticipated expenses under the contract were approximately $9.46 million. There is no evidence that the increased costs associated with the remaining variables identified by Sierra are sufficiently certain to be considered anticipated expenditures. Sierra indicated that the contract cost could have increased by approximately $1.23 million if a Solano County ordinance that allowed the city to deposit biosolids on land located within Solano County was not extended. Although she noted a "recent statewide trend of legislative efforts by local governments to ban biosolids land applications," she acknowledged that it was "impossible to predict at the time" whether the ordinance would be extended. The city acknowledges, however, that the Solano County ordinance was in fact extended, so that there will be no increase in contract expenses as a result of this variable. Sierra also explained that the city is engaged in a two-year pilot program of composting biosolids and that if the program is successful and expanded, the contract cost could increase by $378,000. Although she noted that "composting is an extremely desirable environmentally friendly reuse of the city's biosolids," there is no evidence regarding the present success of that program or the likelihood that it will be expanded. Finally, there is no evidence to suggest that it is even remotely likely, let alone probable, that S&S will elect to use an alternative fuel.

Thus, based on the entire record that was before the trial court when it ruled, the court correctly determined there was no justification for remanding the matter to the board because as a matter of law the board did not have jurisdiction under the charter to approve or disapprove the proposed contract. The trial court, therefore, correctly ordered the PUC to discharge its ministerial duty to award the contract to S&S.

The term of the proposed contract with S&S was to run from December 1, 2007, through November 30, 2012. When the contract is awarded by the PUC pursuant to the writ of mandate in this case, less than five years will remain as the term of the contract. That consequence is unavoidable. If the term of the contract were to be extended beyond the planned termination date, the anticipated expenditures might well exceed those that were calculated for the December 2007 through November 2012 time period. By retaining the termination date on which all cost estimates were based, approval of the

contract unquestionably remains within the province of the PUC and outside the jurisdiction of the board.

## Disposition

The order granting the petition for writ of mandate is affirmed.

McGuiness, P. J., and Siggins, J., concurred.