[No. A124238. First Dist., Div. Four. Dec. 5, 2011.]

WESTAMERICA BANK, Plaintiff and Appellant, v.
CITY OF BERKELEY, Defendant and Respondent.

---

## COUNSEL

Freitas, McCarthy, MacMahon & Keating and Richard P. Murray for Plaintiff and Appellant.

Wulfsberg Reese Colvig & Firstman, Eric J. Firstman, Michael J. Higgins, Deirdre Joan Cox; and Michael K. Woo, City Attorney, for Defendant and Respondent.

---

## OPINION

**RIVERA, J.**—The City of Berkeley (the City) and Arntz Builders entered into a construction contract. Under the contract, the City was entitled to retain a percentage of the moneys earned by Arntz to ensure satisfactory completion of the work (the retention funds). As permitted by law, Arntz placed securities into escrow as a substitute for the retention funds. The terms of the escrow agreement are dictated by statute; they provide, among other things, that the City has the right to draw upon the securities if the contractor defaults, and that the escrow agent (here, Westamerica Bank (the Bank)) must immediately convert the securities to cash and distribute it to the City "[u]pon seven (7) days written notice to Escrow Agent from the City of the default." The escrow instructions also provide that the City and Arntz "shall hold the Escrow Agent harmless from Escrow Agent's release and disbursement of the securities" in reliance on the written notification.

The City sent a written seven-day notice of default to the Bank and demanded immediate liquidation and distribution of the securities to the City.

Arntz objected to disbursement of the securities to the City on grounds that the City was not entitled to the funds pursuant to the terms of the underlying construction contract. Arntz threatened to sue the Bank if the funds were released. The Bank filed a complaint in interpleader, and the City demurred. The trial court sustained the demurrer without leave to amend.

We affirm. It is our conclusion that the complaint, taken together with the escrow agreement, does not show a reasonable probability that the Bank will be subject to double claims which may give rise to double liability if it complies with the City's demand (Code Civ. Proc., § 386), and, accordingly, the Bank has not stated a claim for the equitable remedy of interpleader.

## I.  BACKGROUND

### A.   *The Purpose of Retained Earnings and Applicable Statutes*

Before embarking on our analysis of this case, we will set the stage with a brief discussion of the purpose of retention funds in construction contracts, and a summary of two relevant statutes.

Construction contracts routinely include provisions that allow the owner to withhold a portion of the progress payments earned by the contractor as a means to ensure satisfactory completion of work. As explained by our Supreme Court, "it is common for construction contracts to contain terms that protect an owner's construction funds. Owners and contractors generally structure their contracts to provide for installment payments to the contractor as the work progresses, typically as the work reaches specified stages of completion. [Citation.] '. . . A percentage of funds held until completion of all of the work is called retainage and is intended both to reduce the risk of nonperformance by the contractor and to assure the completion of the work in accordance with the contract terms.' [Citation.] Progress payments and retainage serve to reduce both the owner's and the surety's risk. [Citation.] [¶] Thus, if an owner avoids overpaying the contractor as the project progresses, then the owner should have funds available to apply toward completion of the project in the event of the contractor's default. Indeed, when the surety, pursuant to a bond, undertakes to complete the project itself or expends funds to enable another contractor to do so, the surety is entitled to reimbursement from the retainage. [Citation.] Likewise, if the surety fails to perform under the bond, the owner/obligee may, on its own, look to the marketplace to find a replacement contractor and use the unexpended sums to pay for that contractor's services." (*Cates Construction, Inc. v. Talbot Partners* (1999) 21

Cal.4th 28, 55–56 [86 Cal.Rptr.2d 855, 980 P.2d 407], fns. omitted; see also *Western Landscape Construction v. Bank of America* (1997) 58 Cal.App.4th 57, 59 [67 Cal.Rptr.2d 868] [purpose of retention system is to encourage completion of work by withholding part of moneys earned until work is completed in a satisfactory manner].)

By law, there is an alternative to the withholding of retention funds. A contractor on a public works project may elect to deposit into an escrow account securities equivalent in value to the amount that would have been retained by the owner. (Pub. Contract Code, § 22300.)[1] If the contractor does so, it is entitled to receive the full amount of each progress payment, and no funds are withheld for the retainage. (§ 22300, subd. (a).) Thus, the securities held in escrow are, in purpose and effect, the retained earnings of the contractor held by the public entity/owner against the risk of nonperformance by the contractor, except the funds are actually held by an escrow agent in the name of the owner. (§ 22300, subd. (f).) The purpose of allowing escrowed securities in lieu of retentions is to permit the contractor, rather than the owner, to earn interest on the retention. (See fn. 9, *post*, and accompanying text.) The terms of the entire escrow agreement are mandated by statute, which prescribes how the securities, and the interest they produce, are to be released to the parties. (§ 22300, subd. (f).)

One other statute is pertinent to retention funds and the matters we here address. In the event an owner wrongfully withholds the retained earnings from a contractor, section 7107 grants special remedies. Subdivision (c) of that statute provides that the retention withheld by the public entity/owner must be released to the contractor within 60 days after completion of the work. The statute also provides that if the retention is not released within the time prescribed, "the public entity . . . shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due[, and] in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs." (§ 7107, subd. (f).) The owner is thus subject to statutory penalties if it refuses to release the retention in a timely fashion, but if there is a dispute between the owner and the contractor concerning the work, the owner may withhold up to 150 percent of the disputed amount beyond the prescribed period. (§ 7107, subd. (e).)

We turn now to the history of this action.

B. *The Escrow Agreement*

In 1999, the City contracted with Arntz Builders to carry out the restoration and expansion of the Berkeley Central Library (the Library contract). In

---

[1] All further statutory references are to the Public Contract Code unless otherwise specified.

connection with that contract, as required by law, the City allowed Arntz to "substitut[e] . . . securities for any moneys withheld by [the City] to ensure performance under a contract . . . ." (§ 22300, subd. (a).) Arntz elected to do so, and deposited securities valued at $2,193,895 with the Bank, the escrow agent. By depositing that sum into escrow, Arntz was entitled to receive the full amount of its progress payments from the City.

An escrow agreement was executed by Arntz, the City, and the Bank. As we have noted, the terms of the agreement, governing the rights and obligations of the parties, are controlled by statute. (§ 22300, subd. (f).) The key provisions of the parties' escrow agreement, tracking the statutory language, are these:

"(1) . . . Securities [deposited by Contractor] shall be held in the name of the City, and shall designate the Contractor as the beneficial owner. [¶] . . . [¶]

"(5) Interest earned on the securities . . . held in escrow . . . shall be for the sole account of Contractor and shall be subject to withdrawal by Contractor at anytime and from time to time without notice to City.

"(6) Contractor shall have the right to withdraw all or any part of the principal in the Escrow Account only by written notice to the Escrow Agent accompanied by written authorization from the City to the Escrow Agent that City consents to the withdrawal of the amount sought to be withdrawn by Contractor.

"(7) City shall have the right to draw upon the securities in the event of default by Contractor. Upon seven (7) days' written notice to Escrow Agent from the City of the default, Escrow Agent shall immediately convert the securities to cash and shall distribute the cash as instructed by the City.

"(8) Upon receipt of written notification from City verifying that the Contract is final and complete, and that the Contractor has complied with all requirements and procedures applicable to the Contract, Escrow Agent shall release to Contractor all securities and interest on deposit . . . .

"(9) Escrow Agent shall rely on the written notifications from City and Contractor pursuant to Paragraphs 5 through 8, inclusive, of this agreement and City and Contractor shall hold the Escrow Agent harmless from the Escrow Agent's release and disbursement of the securities and interest as set forth above."

C.  *Procedural History*

In 2003, Arntz sued the City in Alameda County Superior Court for breach of the Library contract, which action was consolidated with several other

lawsuits filed by subcontractors against Arntz and the City. Apparently, the City alleged in its Answer that offsets were due for defective work. Trial of the action was divided into four phases. "Phase One" was a bench trial on the issue of whether Arntz's action was barred for failure to comply with Government Code claim requirements. The trial court ruled against Arntz but that ruling was reversed and the matter was remanded for further proceedings.

While that appeal was pending, on June 27, 2008, Arntz filed an application for a temporary restraining order, seeking to prevent the City from obtaining the securities being held in escrow. On July 8, 2008, the City sent a letter to the Bank stating that Arntz was in default and demanding that the Bank release to the City the entire retention amount being held by the Bank, pursuant to the escrow agreement.[2] On July 25, 2008, the court denied Arntz's application for a temporary restraining order and order to show cause regarding preliminary injunction. Specifically, the court rejected Arntz's contentions (1) that the securities are Arntz's property because the City had not paid Arntz in full for the work done under the Library contract, (2) that the City must first prove its own contractual performance and its right to the securities, and (3) that Arntz would be irreparably harmed if the securities were converted to cash and distributed to the City.

In the meantime, on July 15, 2008, Arntz sent a letter to the Bank, with a copy to the City, objecting to the City's demand, and explaining that Arntz and the City had been involved in "extremely contentious litigation [in which] Arntz disputes that the City has any right to access the securities" because the project has been deemed complete since September 2003 and the City never declared any default during the course of construction. Arntz threatened legal action against the Bank if it released any funds to the City, and strongly urged the Bank instead to file an interpleader action.[3] Arntz also offered to indemnify the bank should its posting of the securities in the interpleader action result in loss of value. In response, the City wrote to the Bank stating that Arntz's arguments "need not concern the Bank" because the disputes will be determined by the court, not by the Bank. The City

---

[2] Apparently an earlier demand letter had been sent to the Bank on June 30, 2008, but because it was signed by someone other than the individual designated in the escrow agreement as the person who would provide notice on behalf of the City, a second letter was sent explaining that the previously designated person was no longer with the City and that the signator of the letter (the library building project manager) was authorized to give notice on behalf of the City.

[3] Arntz's letter stated: "This [release of funds to the City] should not happen and the Bank must take some affirmative act to obtain a judicial determination of what its obligations are; the interpleader action that has been discussed." "If the Bank releases the funds to the City . . . then Arntz would also need to immediately file an action against the Bank . . . . Arntz though has no interest in suing its Bank and so requests that before any action is taken to convert the funds that the Bank obtains [sic] some judicial determination of what and how it should proceed."

stated, further, "the Escrow Agreement is clear, the City has provided notice, and the bank should be prepared to deposit the funds into an account upon receipt of the City's instructions . . . ." According to the City, "Arntz'[s] attempt to interplead the funds [was] a transparent delay tactic—an attempt to permanently escape responsibility for repairs, which would irreparably harm the City, and breach the terms of the escrow."

On July 28, 2008, the Bank filed a complaint in interpleader in Marin County Superior Court. The core allegations of the complaint are these: The Bank received a letter from the City which was intended "to constitute notice of default by ARNTZ pursuant to the [Library contract] and to serve as notice to [the Bank], as Escrow Agent, to liquidate the Securities and pay over all the proceeds to [the City] according to the terms of the Escrow Agreement"; the Bank also received a letter from Arntz in which it "denies that it [was] in default of the [Library contract], disputes the validity of the default notice as contained in the [City's] Letter, disputes the ability of [the City] to issue any default notice at this time and raises other various defenses and claims to [the City's] demand that Escrow Agent liquidate the Securities and pay the proceeds to [the City]"; the Bank "is informed and believes . . . that a dispute between . . . [the City] and [Arntz] has arisen, such that conflicting instructions concerning entitlement to the Securities, existence of a default, whether or not proper notice of default has been furnished and other disputes, . . . has rendered it difficult or impossible to determine what action, if any [the Bank] should take . . ."; the Bank is "unable to safely determine which of the . . . claims or anticipated future claims is valid"; and the Bank "has therefore elected to institute this action in interpleader."

Attached to the complaint and incorporated by reference are the escrow agreement, the aforementioned letter sent by Arntz, and the City's response to Arntz's letter.

The City demurred to the Bank's complaint. It contended that the statutorily mandated escrow agreement contains a specific hold harmless clause protecting the Bank from liability for complying with the City's written notice, and in this way, the Legislature effectively eliminated any need for interpleader. According to the City, "the [L]egislature has . . . directed [the Bank] to act based on facts pleaded in the Complaint," i.e., City's written demand on the Bank to liquidate and distribute the securities, "and [has] guaranteed that [the Bank] can act safely," so Arntz's threats of suit are not sufficient to show that the Bank is at risk of double liability.[4]

---

[4] The City also argued that any right of Arntz to the securities was adjudicated in Phase One of the trial when the trial court ruled that Arntz's claims were barred by its failure to file a Government Code claim. As has been noted, that ruling was reversed on appeal.

The Bank argued, in response, that a hold harmless clause does not protect it from being *sued* by either the City or Arntz, and thus it "can be exposed to double vexation and a multiplicity of suits even though ultimately contractual defenses may result in only one liability," and that nothing in the statutory escrow agreement precludes the maintenance of an interpleader action.

The trial court sustained the demurrer without leave to amend, not on the ground that no interpleader cause of action was stated, but on the alternative ground of exclusive concurrent jurisdiction, an issue raised in the court's tentative ruling and subsequently argued in supplemental briefing. The court concluded that the Bank "may be protected from liability . . . by the hold harmless clause of the escrow agreement," but in any event, the core issue had been previously decided by the Alameda County Superior Court when it denied Arntz's application for a temporary restraining order and preliminary injunction to prevent the Bank from converting the securities and releasing the funds to the City. "Necessarily, this court will be asked to reconsider the same issues that have been considered by the Alameda Superior Court, albeit with the Bank as a new plaintiff. The Alameda Court has jurisdictional priority over the underlying dispute between the City and Arntz, and, by extension, over the Bank in its role as escrow agent under the escrow agreement. [Citation.] This court will not interfere with the orderly process of the Alameda Court in the ongoing litigation."

The court entered a judgment of dismissal, and the Bank appealed.[5] The parties stipulated to a 180-day stay of this appeal based upon the expectation that resolution of the underlying action between Arntz and the City would resolve or render moot the issues presented in this appeal. In October 2009, judgment was entered in favor of the City and against Arntz in the underlying action, and in March 2010, the court issued an order granting the City's motion for attorney fees. Arntz's appeals from the judgment and order are pending. The Bank now proceeds with this appeal.

## II.   DISCUSSION

### A.   *Standard of Review*

" 'A demurrer tests the legal sufficiency of the complaint . . . .' [Citations.] On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] We give the

---

[5] Prior to the appeal Arntz apparently filed a new action in Alameda County against the City and the Bank, seeking declaratory relief, and the Bank cross-complained; that action, however, was dismissed without prejudice.

complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.] If no liability exists as a matter of law, we must affirm that part of the judgment sustaining the demurrer. [Citation.]" (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1500–1501 [82 Cal.Rptr.2d 368] (*Lazar*).)

"The well-pled allegations that we accept as true necessarily include the contents of any exhibits attached to the complaint. Indeed, the contents of an incorporated document (in this case, the agreement) will take precedence over and supersede any inconsistent or contrary allegations set out in the pleading. In the case of such a conflict, we will look solely to the attached exhibit. [Citations.]" (*Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1409 [19 Cal.Rptr.3d 562] (*Mazur*).)

"While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment. [Citations.] A trial court abuses its discretion if it sustains a demurrer without leave to amend when the plaintiff shows a reasonable possibility to cure any defect by amendment. [Citations.] If the plaintiff cannot show an abuse of discretion, the trial court's order sustaining the demurrer without leave to amend must be affirmed. [Citation.]" (*Lazar, supra*, 69 Cal.App.4th at p. 1501, fn. omitted.)

## B. *Action in Interpleader*

"Any person, firm . . . or other entity against whom double or multiple claims are made, or may be made, by two or more persons which are such that they may give rise to double or multiple liability, may bring an action against the claimants to compel them to interplead and litigate their several claims." (Code Civ. Proc., § 386, subd. (b).) "Interpleader is an equitable proceeding by which an obligor who is a mere stakeholder may compel conflicting claimants to money or property to interplead and litigate the claims among themselves instead of separately against the obligor." (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 237, p. 317.)

A complaint in interpleader must show that "the defendants make conflicting claims to [the subject matter], and that the [plaintiff] cannot safely determine

which claim is valid and offers to deposit the money in court . . . ." (4 Witkin, Cal. Procedure, *supra*, Pleading, § 248, p. 327 [" 'the code requires nothing more . . . than to show that the parties to be called in make claims on him for the same thing, that the respective claims are adverse to each other, and that he cannot safely determine for himself which claim is right and lawful'; [citations]"], citing & quoting *Fidelity Sav. etc. Assn. v. Rodgers* (1919) 180 Cal. 683, 684–685 [182 P. 426].) The right to the remedy of interpleader is founded on the consideration that a person is threatened not just with double liability, but with double vexation in respect to one liability. (*Hancock Oil Co. v. Hopkins* (1944) 24 Cal.2d 497, 510 [150 P.2d 463] (*Hancock Oil*).) An interpleader action, however, may not be maintained "upon the mere pretext or suspicion of double vexation; [the plaintiff] must allege facts showing a reasonable probability of double vexation" (*ibid.*), or a "valid threat of double vexation" (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1125–1126 [84 Cal.Rptr.2d 361]).

To ascertain whether the Bank has alleged facts to support the equitable remedy of interpleader, we examine the allegations of the complaint together with the provisions of the escrow agreement attached to the complaint, in light of the applicable statutes.[6]

### C.   *Construction of the Escrow Agreement and Legislative Intent*

■   An escrow agreement would normally be analyzed under principles of contract interpretation, by which we seek to discern and carry out the intentions of the parties. (*Plaza Home Mortgage, Inc. v. North American Title Co., Inc.* (2010) 184 Cal.App.4th 130, 135–136 [109 Cal.Rptr.3d 9].) Here, however, the entire agreement is dictated by law. We therefore apply the rules of statutory interpretation, which are, to determine the intent of the Legislature if possible by the plain meaning of the statutory language and if necessary by reference to the overall statutory scheme, public policy, or legislative history. (*California Correctional Peace Officers Assn. v. State of California* (2010) 189 Cal.App.4th 849, 856–857 [117 Cal.Rptr.3d 109].)

■   Contrary to the Bank's contentions, there is no lack of clarity in the statutory terms of the escrow agreement. The Legislature has spelled out a brief and specific list of rights and duties which are both circumscribed and mutually exclusive. The Bank must pay to Arntz the interest accrued on the escrowed securities upon demand by Arntz; no notice to the City is required. Similarly, when the City notifies the Bank of a default and demands distribution of all or part of the escrowed funds, the Bank must "immediately" comply with that demand. Any disbursement of the escrowed securities

---

[6] Respondent's request for judicial notice filed August 29, 2011, is granted.

*to Arntz* requires written authorization from the City. As for the Bank, it "shall rely on the written notifications" specified in the agreement, and the City and Arntz "shall hold [the Bank] harmless" when it complies with the disbursements required by the instructions. (§ 22300, subd. (f).) No other documentation is required from either party.[7]

The Bank's primary contention is that it faces "conflicting instructions" regarding whether the securities should be released to the City, and therefore it is entitled to interplead the funds and to force Arntz and the City to litigate this issue. In support, it cites *Hancock Oil, supra,* 24 Cal.2d at page 508; *Security Trust etc. Bank v. Carlsen* (1928) 205 Cal. 309 [271 P. 100]; *Pacific Loan Management Corp. v. Superior Court* (1987) 196 Cal.App.3d 1485 [242 Cal.Rptr. 547]; and *Continental Nat. Bank v. Stoltz* (1920) 46 Cal.App. 532, 534 [189 P. 712]. In none of these cases, however, did the escrow agreement provide that the stakeholder would be held harmless by the parties when it complies with enumerated escrow instructions. The Bank's allegation that it is unable "safely" to determine how to proceed cannot therefore be credited. (*Mazur, supra,* 122 Cal.App.4th at p. 1409.) The terms of the statutory agreement direct the Bank's choice. If the Bank complies with the City's written notice, it will be held harmless. Only by refusing to comply will the Bank be subject to unprotected litigation for breach of the agreement.

The Bank argues that the hold harmless agreement does not provide protection from double vexation because it "does not bar the filing of a lawsuit against Westamerica by . . . Arntz or the City, or any judgment from being entered against Westamerica[, but] only creates a contractual right for Westamerica to impose responsibility for payment of the judgment onto [Arntz or the City] . . . . Westamerica still has primary responsibility for any such judgment and may well be the one to pay it if the party responsible for holding Westamerica harmless is insolvent." The Bank cites no authority for this proposition. But even assuming the hold harmless clause does not protect the Bank from being *sued* by Arntz (see, e.g., *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1024 [124 Cal.Rptr.3d 105]), the Bank's risk is nonetheless minimal because defense of any such lawsuit immediately can be tendered to the Bank's indemnitor(s).[8] (*United States Elevator Corp. v. Pacific Investment Co.* (1994) 30 Cal.App.4th 122, 125–126 [35 Cal.Rptr.2d 382];

---

[7] Although the escrow agreement does not preclude an interpleader action, neither does it provide for one. (Cf. *Pacific Firestone Escrow Co. v. Food Giant Markets, Inc.* (1962) 202 Cal.App.2d 155, 158 [20 Cal.Rptr. 570] [escrow agreement carrying out statutory requirements of liquor license transfer expressly provides that escrow holder has the right to interplead funds if a dispute arises among creditors to be paid from escrowed funds].)

[8] We do not decide the question of whether the hold harmless clause could prevent Arntz and the City from suing the Bank for complying with the written notifications enumerated in the escrow agreement. (See, e.g., *Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 9 [56 Cal.Rptr.3d 528].) That issue is not before us.

Civ. Code, § 2778, subd. 4.) In any event, under the circumstances of this case, Arntz would have little to gain by filing an action against the Bank. As we have noted, Arntz and the City are already engaged in litigation over their contractual duties under the Library contract. If the right to the retention fund is genuinely in dispute, Arntz is free to pursue the City under section 7107 and to seek the enhanced remedies of penalties and attorney fees not available in an action against the Bank. Finally, while it is literally *possible* that the City could become insolvent, leaving the Bank on the hook if a judgment were entered against it, the record is utterly devoid of any evidence concerning the City's financial condition. The mere hypothetical possibility of a municipal bankruptcy is simply too slender a reed upon which to force the City into litigation by way of interpleader.

The Bank points to paragraph 9 of the agreement, arguing that it "provides that the bank is to follow the instructions of both the City and Arntz, but provides no procedure to follow in the event of conflicting instructions." The Bank mischaracterizes that provision. Paragraph 9 states only that the Bank "shall rely on the written notifications from City and Contractor *pursuant to Paragraphs 5 through 8, inclusive*, of this agreement. . . ." (Italics added.) As we have described, each instruction in paragraphs 5 through 8 is complete unto itself and mutually exclusive, so there is no possibility of "conflicting instructions" pursuant to those paragraphs. Paragraph 9 neither authorizes nor requires the Bank to follow any instructions that are dehors the signed agreement.

In a similar vein, the Bank contends it is entitled to interplead the funds because "the City and Arntz each claim rights to the securities, and have provided Westamerica with conflicting instructions, which the bank is *contractually* obligated to comply with." (Italics added.) But the Bank cites to no provision in the escrow agreement that would contractually obligate it to accede to Arntz's request to halt the liquidation and disbursement of the securities in the face of the City's demand. Indeed, any claim by Arntz that it has a *contractual* right to demand that the securities be withheld would constitute a unilateral change in the terms of the escrow agreement, which is not permitted, either under common law (*Diaz v. United California Bank* (1977) 71 Cal.App.3d 161, 166 [139 Cal.Rptr. 314]), or by statute (§ 22300, subd. (f) ["The escrow agreement . . . shall be null, void, and unenforceable unless it is substantially similar to the [prescribed] form . . . ."]).

Our conclusion that the escrow agreement authorizes the City unilaterally to declare a default and to receive a distribution of the escrowed securities comports fully with the fundamental purpose of retentions. As we have discussed, retained earnings serve as an incentive for timely completion of the contract. They are effective for this purpose precisely because they are

under the control of the owner who can use them if the contractor defaults on his obligations. (*Cates Construction, Inc. v. Talbot Partners, supra*, 21 Cal.4th at pp. 55–56.) Of course, the owner does so at its peril and can be subject to hefty penalties and attorney fees if it is shown that all or part of the retention should have been released to the contractor. (§ 7107.) The statutory scheme thus provides to the contractor a powerful remedy for wrongful withholding of the retention fund, but it does not allow the contractor to obstruct the public entity's control over it. The Bank's theory would require a different result for escrowed retention funds, viz., the mere threat of suit by the contractor could force the owner into litigation in order to access *its own* retention fund. We do not think the Legislature intended that public entities be disadvantaged in this way when it adopted the law requiring that contractors be allowed to substitute escrowed funds for retentions.

The original statute authorizing contractors to substitute escrowed securities for retentions was Government Code former section 4590. (Stats. 1981, ch. 866, § 1, pp. 3322–3323.) We have examined the legislative history of former section 4590 of the Government Code (precursor to Pub. Contract Code, § 22300), and find nothing to suggest a different result. Its purpose was not to interfere with the public entities' control over retention funds, but to permit contractors to earn interest on the unpaid funds.[9] In 1986 the statute was amended to add the required form of the escrow agreement. (Stats. 1986, ch. 1167, § 1, pp. 4155–4158.) As first proposed, the bill did not include the paragraph authorizing the public agency to make a demand on the escrow holder to liquidate and distribute the escrowed securities. (Sen. Bill No. 2374 (1985–1986 Reg. Sess.) introduced Feb. 21, 1986.) The County Supervisors Association of California and League of California Cities, the Los Angeles Unified School District, and the Association of California Water Agencies (ACWA) wrote letters opposing the bill, because it lacked any provision by which the public agencies could access the escrowed funds.[10] ACWA proposed the addition of a paragraph, giving owners the right to demand that the

---

[9] See, e.g., Ways and Means Staff Analysis of Senate Bill No. 835 (1981–1982 Reg. Sess.) as amended August 26, 1981, paragraph 1 ("This bill would allow the contractor to substitute securities [for sums withheld from progress payments] . . . in a value equivalent to that which would be withheld. The contractor would retain any interest earned on the securities. . . . Major fiscal impact would be an undetermined reduction in interest to the state and local agencies."); and see Enrolled Bill Report on Senate Bill No. 835 (1981–1982 Reg. Sess.) Business and Transportation Agency, September 21, 1981 ("State and local public agency contracts usually provide for the retention of a stated percentage of a contractor's earnings as a means to ensure completion of all the contractor's obligations. [¶] This bill . . . requires public contracts to provide for the contractors to withdraw the retained funds by substituting 'equivalent securities.' The contractor becomes the beneficial owner of the substituted securities and receives interest on them.").

[10] See Victor Pottorff, County Supervisors Association, and Dwight R. Stenbakken, League of California Cities, letter to Senator Ralph Dills, April 14, 1986; Santiago Jackson, Los

securities be liquidated and distributed upon written notice of default. (Louis B. Allen, ACWA, letter to Sen. Ralph Dills, May 27, 1986.) ACWA stated that the amendment was "necessary in order to assure timely completion of public projects." (*Ibid.*) The bill was amended to include the paragraph proposed by ACWA and specified seven days' written notice (Sen. Bill No. 2374 (1985–1986 Reg. Sess.) as amended Aug. 11, 1986), and was adopted with that provision (Stats. 1986, ch. 1167, § 1, pp. 4155–4158), indicating the lawmakers' intent to ensure that public agencies have expeditious access to the substituted retention funds.[11]

To summarize: The escrow instructions are clear. The deposited securities are held in the name of the City, and Arntz is designated the "beneficial owner." As the beneficial owner, Arntz is unconditionally entitled to distribution of all the interest generated by the securities, but it has no legal or contractual right to all or any part of the principal without written authorization of the City. If the City gives notice of the contractor's default and demands liquidation of the securities and distribution of the funds, the Bank must "immediately convert the securities to cash and . . . distribute the cash as instructed by the City." The hold harmless clause entitles the Bank to rely upon the prescribed written notifications, *vel non.*

The Bank has not alleged that the City's written notification of default and demand for distribution of the retention fund is *itself* insufficient or defective, or that the escrow instruction is *itself* unclear. It alleges only that Arntz has called into question the facts upon which the notification and demand are predicated, and has threatened suit. We see nothing in the statutorily mandated escrow agreement that permits Arntz to obstruct the City's right to disbursement of the securities by asserting contractual defenses it may have under the separate Library contract. Indeed, Arntz has already attempted, and failed to prevent release of the funds in the very litigation where it is asserting its contract claims.

The Bank's primary obligation as an escrow agent is to comply strictly with the escrow instructions. (*Markowitz v. Fidelity Nat. Title Co.* (2006) 142 Cal.App.4th 508, 526 [48 Cal.Rptr.3d 217].) Here, the Bank can do so without substantive risk. If the City's demand on the Bank was improper *under the terms of the Library contract*—a matter that should be resolved in the Library contract litigation—Arntz has a remedy against the City, which

---

Angeles Unified School District, letter to Senator Ralph Dills, May 19, 1986; Louis B. Allen, ACWA, letter to Senator Ralph Dills, May 27, 1986.

[11] We note the Legislature did *not* adopt language proposed by the Los Angeles Unified School District which would have required the public entity/owner to submit to the escrow agent documentation that its governing board had authorized a permanent withholding of all or part of the retention for specified reasons. (Santiago Jackson, Los Angeles Unified School Dist., letter to Sen. Ralph Dills, May 19, 1986.)

could include a substantial claim for penalties and attorney fees. (§ 7107.) Should Arntz nevertheless decide to bring an action against the Bank as well, the Bank is protected by the hold harmless clause. We, accordingly, conclude that the equitable remedy of interpleader is not available on the facts alleged when taken together with the terms of the escrow agreement. We see no reasonable probability that the Bank's compliance with the City's demand would subject the Bank to double vexation, much less to "double . . . claims . . . which are such that they may give rise to double . . . liability" (Code Civ. Proc., § 386, subd. (b)).

### D. *The Bank's Remaining Arguments*

The Bank has alleged in its complaint that "neither the code, nor case law, provide significant guidance as to what procedures are required for a public entity to declare a default prerequisite to demanding liquidation of securities, what constitutes a proper notice of default, how to determine if notice of default is timely, what procedures are to be followed by the Escrow Agent in the event any party disputes the validity of a notice of default and request to liquidate securities, and numerous other issues . . . concerning interpretation of the Escrow Agreement and/or the duties and responsibilities of WESTAMERICA as Escrow Agent." Based upon these allegations the Bank argues it is improper for a court to interpret the terms of the agreement against plaintiff in the context of a demurrer. The authorities cited for this proposition, however, involved scenarios in which demurrers had been sustained after the plaintiffs had alleged that the contract in dispute was ambiguous. Under those circumstances the courts held that it was improper to resolve the issue against plaintiffs solely on the pleadings. (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233]; *Shaw v. Metro-Goldwyn-Mayer, Inc.* (1974) 37 Cal.App.3d 587, 599 [113 Cal.Rptr. 617].) Here, the Bank alleges that Arntz disputes the City's declaration of default and its right to the securities under the Library contract, and that there is an absence of legal authority governing the requirements of a default notice. But the Bank nowhere alleges that the escrow agreement *itself*—or, more specifically, the instruction here at issue—is unclear or ambiguous. Accordingly, interpretation of the agreement at the demurrer stage is appropriate.

The Bank contends it should have been granted leave to amend the complaint to seek declaratory relief by adding an allegation that the person signing the City's demand was not the person authorized under the Escrow Agreement to sign the City's demand. As we have discussed, the Bank bears the burden of demonstrating that the trial court's ruling—sustaining the demurrer without leave to amend—was an abuse of discretion. (*Lazar, supra,* 69 Cal.App.4th at p. 1501.) If the plaintiff does not proffer a proposed

amendment, and does not advance on appeal any proposed allegations that will cure the defect or otherwise state a claim, the burden of proof has not been satisfied. (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636–637 [75 Cal.Rptr. 766, 451 P.2d 406] [cure defect]; *Stanson v. Brown* (1975) 49 Cal.App.3d 812, 814 [122 Cal.Rptr. 862] [state cause of action].)

The Bank's request for leave to amend was raised for the first time at oral argument on the demurrer, without specification of any legal basis for declaratory relief, but only an articulated desire for "some direction as to what to do." Neither Arntz nor the Bank have actually questioned the authority of the signatory to act on behalf of the City either in the trial court or on appeal. The Bank on appeal makes a theoretical argument about "what procedures the parties . . . should undertake when endeavoring to change the authorized representatives under that agreement" and "whether some notice from the City, such as a resolution of the city council, was not the appropriate vehicle for changing the identity of the person authorized to give . . . notice . . . ." But the Bank has nowhere asserted there is an *actual dispute* as to the signatory's authority, which is the sine qua non of a declaratory relief action. (Code Civ. Proc., § 1060 ["Any person interested under a written instrument, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties . . . ."].)

The Bank also urges that the allegations of its complaint are sufficient to state a cause of action for declaratory relief, if not for interpleader. But in making this argument, the Bank raises the identical issues implicated in its interpleader complaint. It argues that the Bank was faced with "conflicting demands" by the City and Arntz, and that the law fails to provide guidance regarding what procedures are required for a public entity to declare a contractor in default, what constitutes a valid notice of default, how to determine whether a notice of default is timely, and what the escrow agent should do in the event a party disputes the validity of a notice of default, as well as other unspecified issues. Based upon these allegations, the Bank makes the conclusory claim that "even if Westamerica did not state a valid claim for interpleader, the complaint when liberally construed does state a claim for declaratory relief." But the Bank provides no relevant authority for this proposition, nor has it asserted there is an actual dispute between *itself* and the City regarding its obligations under the escrow agreement.

Accordingly, the Bank has not demonstrated that the trial court abused its discretion in denying leave to amend to add a cause of action for declaratory relief.

## III.  DISPOSITION

The judgment is affirmed.[12]

Ruvolo, P. J., and Reardon, J., concurred.

---

[12] Because we conclude no action for interpleader or declaratory relief will lie, we do not address the alternative basis for sustaining the demurrer, viz., the doctrine of exclusive concurrent jurisdiction.