Filed 12/20/21  Royals v. Lu CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LISA ROYALS,<br><br>    Plaintiff and Respondent,<br><br>                            v.<br><br>MENG JING LU,<br><br>    Defendant and Appellant;<br><br>BANK OF AMERICA, N.A.,<br><br>    Defendant and Respondent. | A160265<br><br>(Contra Costa County Super. Ct. No. MSP19-01563) |

Meng Jing Lu appeals from an order granting the application of Bank of America N.A. (BofA) under Code of Civil Procedure 386.5[1] to interplead funds held in certain accounts that are subject to conflicting demands from Lu and from Lisa Royals.  Lu also appeals an award to BofA of the attorney fees it incurred in obtaining the interpleader order.  We see no error and shall affirm.

## I. BACKGROUND

Chambers Daniel Adams passed away October 14, 2019, at age 99.  Following his death, a dispute arose between his wife, Lu, and Royals, his

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

1

only child and daughter from a prior marriage, over the ownership of funds held by BofA in various bank accounts. Royals is the trustee and sole beneficiary of the Adams Trust, a trust established in the early 1990's by Adams and his former wife of 56 years, Cornelia Adams, who passed away in 2008.[2] Lu, Adams's second wife, was 59 years old when she married Adams, then 95 years old, in 2015.

On October 24, 2019, acting in her capacity as trustee of the Adams Trust, Royals filed a verified petition under section 850 of the Probate Code alleging three claims—first for return of trust property, second for undue influence, and third for financial elder abuse. She named both Lu and BofA as defendants on the first claim. She named only Lu on the second and third claims. In support of these claims, Royals alleged generally as follows.

For many years prior to his death, Adams's estate included a home in Orinda and a second home in Sea Ranch; Adams had many conversation with Royals in which he assured her that Royals would inherit both homes; following his marriage to Lu, Adams assured Royals that the marriage would not interfere with Royals's right to inherit both houses, which were then debt-free; Adams had deliberately made no provision in his will for the support of Lu; in the last few years of Adams's life, while he was in failing health and under the dominating influence of Lu, and though he was not in need of cash, Adams borrowed $400,000 secured by a mortgage on the Orinda home; he then sold the Sea Ranch home for $695,000; and the proceeds of the

_____

[2] About the structure of the Adams Trust, Royals alleges that "[t]he Trust names Mr. and Mrs. [Cornelia] Adams as the original cotrustees of the Trust . . . , and, following their deaths, names [Royals] as the successor trustee. . . . [¶] . . . Upon the death of the first spouse, the Trust splits into two subtrusts: a revocable Survivor's Trust and an irrevocable Family Trust. . . . [¶] . . . [Royals] is named as the sole beneficiary of both subtrusts upon the death of the second spouse."

2

loan on the Orinda home and of the sale of the Sea Ranch home—amounting to $1,095,000—were deposited in an account denominated -9029 at BofA (the 9029 Account), one of two BofA accounts Lu jointly held with Adams.

In the first claim for return of property, Royals alleges that as trustee of the Adams Trust she has an ownership claim to any proceeds of the loan on the Orinda home and of the sale of the Sea Ranch home and that those funds should be distributed directly to her. In Royals's second and third claims for undue influence and financial elder abuse, Royals alleges claims for damages against Lu. By way of relief, Royals seeks orders compelling BofA to transfer to the Adams Trust the loan and sale proceeds from a specific account (identified as the 9029 Account) or "any other account to which [Lu] has transferred them."

Together with her petition, Royals filed an application for a right to attach order seeking to attach "[a]ll bank accounts at Bank of America on which Meng Jing Lu appears as an account holder including" the 9029 Account. The following day, the trial court issued Royals a temporary protective order (TPO) "freezing" and banning any transactions in "[a]ny and all accounts at Bank of America on which Meng Jing Lu appear[s] as an account holder," including the 9029 Account. On Royals's and Lu's stipulation, the trial court later ordered that the TPO would remain in effect until the court ruled on the attachment application.[3]

---

[3] Over the opposition of Lu, the court granted the right to attach application many months later, on September 4, 2020. In support of her opposition, Lu submitted her own declaration and several other declarations. These declarations, collectively, describe Adams's courtship of Lu (which began in 2011, several years before their marriage), her decision to move from Las Vegas to Orinda to cohabitate with him, his proposal of marriage and her decision to accept the proposal in 2015, and the observations of

3

On January 23, 2020, BofA answered Royals's petition and simultaneously filed a motion for interpleader and discharge under section 386.5. The interpleader motion disclosed that on receiving the TPO, BofA had frozen all of Lu's accounts[4] and that, while the 9029 Account contained no funds, the aggregate balance of the other frozen accounts was $250,558.14. The interpleader motion asserted that BofA was simply a stakeholder, having no interest in the frozen funds, and that BofA wished to deposit the frozen funds with the court clerk. BofA took the position that it was subject to conflicting demands from the Adams Trust, on the one hand, and from Lu, on the other, to funds held in accounts bearing Lu's name.

Alleging that it could not determine which of these two competing claims was valid without exposing itself to potential liability to the disappointed claimant, BofA asked that the court grant its interpleader

---

people who knew the couple about the genuineness of Adams's affection for Lu and the transformation in his demonstrated level of contentment after he met her late in his life. Lu attaches to her declaration 32 documentary exhibits, including extensive, detailed correspondence between Royals and Adams discussing his testamentary intent. Also included in this opposition evidence are statements from Adams's doctor, dentist, a real estate broker and others who dealt with him in the year before he died, all of whom attest to his full cognitive acuity until his death, despite his physical decline. Suffice it to say that the portrayal of Adams that we glean from Lu's evidence opposing the issuance of a writ of attachment—showing his mental condition in his final years, his intentions in disposing of his property after his death, and his desire to make financial provision for Lu—contrasts sharply with the portrayal of Adams that Royals offers in her petition.

[4] There appear to be six accounts involved here. Only $2,424.49 of the frozen funds came from an account (no. -0873) to which Adams and Lu were both signatories. The rest came from Lu's personal accounts: $149,309.46 in account no. -1266, $96,195.21 in account no. -0698 and $2,628.98 in account no. -4099. A fifth account, no. -3137, had a zero balance. The 9029 Account also had a zero balance.

motion, to allow BofA to deposit the disputed funds with the clerk, and then to discharge BofA from further liability in the suit. In support of the motion, BofA submitted a declaration from an assistant vice president stating that it was "prepared to tender immediately the sum of $250,558.14, *i.e.* the funds currently frozen in the At-issue Accounts, with the Clerk of Court." BofA also sought an award of its costs and attorney fees under section 386.6, subdivision (a).

Lu's opposition to the interpleader motion argued that BofA did not face a threat of double vexation warranting interpleader because (1) Royals's undue influence and elder abuse claims were alleged only against Lu, not BofA, (2) only Lu had a deposit agreement with BofA, and (3) Royals's claim was not yet reduced to judgment. Though denying that BofA was subject to conflicting demands, Lu's opposition made it clear that she still claimed the funds in the frozen accounts: "it is undisputed that Respondent Lu is the legal owner of the funds," Lu asserts. Lu opposed BofA's request for an attorney fees award, claiming any award would be inequitable because BofA had acted in bad faith "and is not a disinterested party."

On March 12, 2020, following a hearing, the court granted BofA's interpleader motion and entered an order directing BofA to deposit the frozen $250,558.14 with the court clerk and be discharged from the action. The order also awarded BofA $3,930 in fees and costs "which amount is to be withheld from the $250,558.14." Lu timely appealed the order granting BofA's motion and awarding fees and costs.[5]

---

[5] Only BofA appeared as a respondent in this appeal. Royals is not a party to the appeal.

5

## II. DISCUSSION

Although the order granting BofA's interpleader motion and awarding attorney fees is interlocutory, it is appealable because it fully resolves the only claim or issues in this action involving BofA. (*Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 118–119.) BofA contends that we should review the order for abuse of discretion. Lu points out, however, that abuse of discretion is a multilayered standard of review (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712), and that to the extent the trial court's ruling is based on an application of law to undisputed facts, our review is de novo, since errors of law are necessarily beyond the permissible range of the trial court's discretionary choices (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957). To the extent the facts here are undisputed, we will independently review the court's application of law to those facts. And to the extent the court made factual findings, our review will be for substantial evidence.

"Where the only relief sought against one of the defendants is the payment of a stated amount of money alleged to be wrongfully withheld, such defendant may, upon affidavit that he is a mere stakeholder with no interest in the amount or any portion thereof and that conflicting demands have been made upon him for the amount by parties to the action, upon notice to such parties, apply to the court for an order discharging him from liability and dismissing him from the action on his depositing with the clerk of the court the amount in dispute and the court may, in its discretion, make such order." (§ 386.5.) " ' "The purpose of interpleader is to prevent a multiplicity of suits and double vexation. [Citation.] 'The right to the remedy by interpleader is founded, however, not on the consideration that a [person] may be subjected to double liability, but on the fact that he [or she] is threatened with double

6

vexation in respect to one liability.' " ' " (*Hood v. Gonzales* (2019) 43 Cal.App.5th 57, 71.)

Here, the trial court ruled that BofA has a right to interplead the disputed funds, that BofA shall be discharged from all liability to either Royals or Lu in connection with its handling of the funds, and that $3,930 for BofA's attorney fees shall be deducted from the interpleaded funds. Other than the attorney fees deduction, however, the court has yet to adjudicate the ultimate disposition of the funds as between Lu and Royals. BofA argues that the court's interpleader ruling was correct, given the competing demands from the Adams Trust and from Lu to the same $250,558.14. We agree. According to BofA, it has no interest in the outcome of the dispute and it cannot satisfy either demand without facing potential liability from the disappointed party. Lu contests the validity of BofA's professed disinterestedness, arguing that the disputed funds reside in her personal bank accounts, that only she has a deposit agreement with BofA, and that BofA coordinated its interpleader motion with Royals in an effort to help Royals gain advantage in these proceedings. We see no evidence of collusion.[6] We also think Lu is mistaken that Royals is a complete stranger to the accounts in which the disputed money is held. As trustee of a trust estate established to hold Adams's assets—assets that, according to Royals, were bequeathed to her—Royals claims, in effect, that she is standing in the shoes of Adams, who unquestionably had an ownership interest in money held by

---

[6] Lu complains that BofA sought interpleader before Royals had served it with a summons. This, in our view, does not evidence the kind of secretly coordinated conduct that might rise to the level of collusion. More likely, it simply shows that Royals notified BofA of the pendency of the action before serving it.

7

Lu at his death.  The court made no express finding on this point, to be sure, but that was not necessary.  We will imply it.

Royals alleges in her petition that half of the ownership of both the Orinda and Sea Ranch homes was in the irrevocable Family Trust subtrust, representing the fifty percent community property interest of Adams's first wife, Cornelia.  (See fn. 2, *ante*.)  The reasonable inference that follows is that at least half of any funds realized from the sale or encumbrance of those properties is now subject to Royals's control as trustee of the Adams Trust.  Accordingly, while Lu attempts to claim that the $250,558.14 at issue here is indisputably hers based on her signature authority over the BofA accounts in which the money was held when Adams died, we conclude that the record may be read to support the opposite inference:  Based on the verified allegations in the petition, Royals appears to have a claim to direct ownership and control of at least some of the funds in these bank accounts.  It is the ownership of the funds that counts, not the signature authority over the accounts in which they resided.  Lu makes no claim that the money in the BofA accounts was separate property that she brought to her marriage to Adams.  While there is considerable evidence that Adams may have intended to gift Lu a significant portion of his assets subject to his disposal (see fns. 3, *ante*, and 7, *post*), we understand the petition to allege that he had no power to transfer the portion of the assets in the Family Trust subtrust that represents Cornelia Adams's community property.[7]

_____

[7] We note that some of the evidence Lu presented in opposition to Royals's application for a right to attachment order suggests that the Adams Trust did not encompass the entirety of Adams's estate and that Adams deliberately intended for some of his savings assets not to be held by the Adams Trust so that he could gift those assets to Lu; that he was, in fact, in need of cash to put aside in an investment account outside the Adams Trust

8

In light of the competing claims to ownership of the disputed money here, we think BofA had good grounds to take the position it was looking at a real risk of double vexation. Lu insists that "if Royals has a valid claim and eventually prevail[s] at trial against Lu, at best, Royals currently has a *potential* right to a judgment as a future judgment creditor of Lu." That might have been correct if Royals had sought only damages for undue influence and financial elder abuse. But Lu fails to appreciate the significance of Royals's claim for return of property alleging that the Adams Trust has an ownership interest in the disputed funds. From BofA's standpoint, the return of property claim put Royals on par with Lu as a claimant to those funds. In drawing this conclusion, we wish to emphasize that the trial court's ruling on BofA's interpleader motion, while correct, and supported by the record, has no bearing on whether Royals's petition ultimately has merit. We intimate no view of whether Royals was entitled to an attachment order, which is an issue now pending before us in a separate appeal that is closely bound up with the merits. And we have no idea whether Royals can substantiate the allegations in her petition at a trial in the face of the evidence Lu has marshalled. What is important for now is

---

for Lu's benefit; and that he told Royals she could expect to inherit the Orinda home subject to any encumbrances that he put on it. As detailed in handwritten notes and emails exchanged between Adams and Royals, there appears to have been an unresolved disagreement between Adams and Royals over his desire to leave money to Lu for Lu's support following his death and over Royals's request that she be allowed to become cotrustee of the Adams Trust during Adams's lifetime, an entreaty he firmly rejected, with reminders to Royals that he wished to remain in full control of his assets until he died. Some of these communications can be read to suggest that Adams felt neglected by Royals and that he decided to sell the Sea Ranch property after trying, and failing, to enlist Royals's help in funding the investment account he wished to leave for Lu's benefit.

that, while this dispute is being litigated, BofA may interplead the disputed funds and wash its hands of the matter.

In support of her contention that BofA is not entitled to interpleader, Lu cites *City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114 (*Morgan Hill*), and *Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598 (*Westamerica Bank*), but those cases are inapposite. *Brown* involved allegedly conflicting claims from a law firm and its former partner, Seltzer, to a contingency fee owed by a client, the City of Morgan Hill. Facing a dispute between the law firm and Seltzer over who was entitled to be paid the fee, Morgan Hill sought to interplead the disputed money. Although Seltzer handled the matter that produced the contingency fee, she conceded that the fee was owed to the firm and not to her. Affirming a ruling that there was no right to interpleader, the Court of Appeal held that in light of Seltzer's concession, Morgan Hill failed to show it was facing "identical claims to the same thing, debt, or duty." (*Morgan Hill*, *supra*, at pp. 1122–1125.)[8] *Westamerica Bank* involved allegedly conflicting claims faced by an escrow holder of securities assets deposited by a contractor, Arntz Builders, as a retention to secure completion of a construction project undertaken by Arntz

___

[8] Among the reasons for this conclusion given by the Court of Appeal was this: "[T]he City's decision to file the interpleader complaint likely stemmed from its continuing relationship with Seltzer. When Seltzer's relationship with the Firm ended, Seltzer retained the City as her client, and assisted the City in filing its complaint in interpleader and bringing the motion for interlocutory relief. Concerns about a claimant using interpleader as a substitute for prejudgment attachment certainly seem justified in a situation such as this, where one of the claimants, as the stakeholder's attorney, assists the stakeholder in obtaining the interpleader remedy against that claimant's former law firm." (*Morgan Hill*, *supra*, 71 Cal.App.4th at p. 1126.) As noted above, there is no evidence of any collusion between BofA and Royals here.

for the City of Berkeley. The Court of Appeal, there too, found no right to interpleader. According to the court, the governing escrow contract and statutory scheme provided full indemnity protection to the escrow holder for release of the retention, so long as Berkeley followed the specified escrow procedures in demanding release. (*Westamerica Bank*, *supra*, 201 Cal.App.4th at p. 612.) In this case, unlike *Brown*, Royals has pleaded direct ownership of the disputed funds and thus she has the same claim Lu does to those funds, and, unlike *Westamerica Bank*, BofA has no indemnity protection if it makes the "wrong" choice in refusing a demand from either Lu or Royals.

In addition to contesting BofA's right to interpleader, Lu claims that the court erred in awarding attorney fees to BofA. Lu argues that attorney fees were not awardable to BofA under section 386.6 because that statute expressly states, "the court may, in its discretion, award such party his costs and reasonable attorney fees from the amount in dispute which has been deposited with the court." (§ 386.6, subd. (a).) Lu complains that the court awarded attorney fees to BofA even though nothing had been deposited with the court, which she contends is a prerequisite to an award of fees based on the plain language of the statute. In response, BofA points out that the timing of the pertinent events here—in particular, the decision on BofA's motion and the ruling thereon—coincided with the onset of the emergency caused by the pandemic and the resulting court closures flowing therefrom, which lasted through late May 2020, when Lu filed her notice of appeal. BofA also points out that Lu never raised this objection in the trial court (presumably because she was facing the same court closure that BofA faced

11

during that period of time). BofA contends that, had Lu raised the objection below, it could have hastened to make the deposit.[9]

In the trial court, Lu objected to the award of attorney fees on the ground that BofA had acted in bad faith in seeking to interplead funds, not on the ground that no deposit of funds had yet been made when attorney fees were awarded. Generally, " 'issues not raised in the trial court cannot be raised for the first time on appeal.' " (*Jones v. Wagner* (2001) 90 Cal.App.4th 466, 481.) That rule applies with particular force to errors that could have been corrected if the objections have been raised below. (E.g., *Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1350 [failure to object to specific deficiencies in statement of decision].) To the extent Lu claims BofA's delay in depositing the interpleaded funds is evidence of bad faith, which in turn warrants denial of attorney fees, we reject the argument. It was not an abuse of discretion for the court to accept BofA's sworn statement that it was prepared to deposit the funds immediately. And to the extent Lu claims that awarding fees before BofA had actually interpleaded the funds was an abuse of discretion, we decline to address a timing issue that was never raised in the trial court.

Finally, Lu argues that the judge who granted BofA's interpleader motion was biased against her and should be disqualified for actual bias. We

---

[9] The record is unclear as to whether BofA ever deposited the funds with the clerk. By request for judicial notice and in the alternative that we take evidence on appeal, Lu submits various documents postdating her notice of appeal that she claims show BofA has decided to wait for the outcome of this appeal before depositing the funds. We deferred ruling on that request until this decision on the merits of the appeal. We now deny it. If Lu's contention is true that BofA still has not made the required deposit and, following remand, it continues to withhold those funds, Lu has remedies to rectify the noncompliance in the trial court.

12

note that Lu twice attempted, unsuccessfully, to argue via writ petitions submitted to us in July 2020 that the same judge should have recused herself peremptorily under section 170.6 and for cause under section 170.3. We rejected both petitions summarily. (*Lu v. Superior Court* (July 10, 2020, A160425), petn. den.; *Lu v. Superior Court* (Aug. 4, 2020, A160605), petn. den.; review den. Aug. 26, 2020, S263915.) We are aware, as we were aware in denying the writ petitions, that Lu has interpreted the adverse rulings against her so far and the manner in which those rulings were made[10] as evidence of "cruel treatment" and a racially motivated predisposition to rule against her because "I am a Chinese and married to an older Caucasian gentleman." These are serious charges that we take seriously on review, but on this record we conclude they are founded upon a mixture of speculation and Lu's apparent misunderstanding of the process in which she is involved.

Lu correctly cites *People v. Brown* (1993) 6 Cal.4th 322, for the proposition that she is entitled to raise a constitutionally grounded claim of judicial bias, even where writ review of a statutory disqualification claim has previously been denied. But we see no basis for any claim of judicial bias in this case, based on a violation of due process or any other legal theory. Lu argues that the assigned judge showed an attitude of bias because she announced at a hearing in March 2020 that this case was appropriate for

---

[10] Lu has alleged for example, that the judge granted the TPO "because Lu was a Chinese national with 'significant ties' with China . . . [based on a] preconception that Lu would take the money and run to China, regardless of proof or merits of the case," improperly granted a motion appointing a discovery referee ex parte and then unfairly ordered her to pay for the referee's services after having frozen her bank accounts and rendering her unable to pay the referee, and ordered her to appear personally at the hearing on the attachment application in June 2020, at a time when Lu was hospitalized.

interpleader, without first deciding Royals's still-pending attachment application, and without addressing *Westamerica Bank*, *supra*, 201 Cal.App.4th 598, and *Morgan Hill*, *supra*, 71 Cal.App.4th 1114. These and other suggestions of bias Lu has made amount to nothing more than complaints that the judge decided certain preliminary issues in favor of Royals, the judge did not accept Lu's argument that BofA's interpleader motion was an improper substitute for attachment, and the judge did not provide reasons for rejecting Lu's opposition to interpleader. None of this proves bias. We see no evidence that this judge—whose challenged rulings, it turns out, were correct—evidenced any lack of neutrality.

## III. DISPOSITION

Affirmed. Respondent to recover its costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
ROSS, J.*

---

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.