[No. B233052. Second Dist., Div. Eight. June 21, 2012.]

MICHAEL LESLIE PRODUCTIONS, INC., Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent.

1012

1014

**COUNSEL**

Roxborough, Pomerance, Nye & Adreani, Drew E. Pomerance and Burton E. Falk for Plaintiff and Appellant.

Carmen A. Trutanich, City Attorney, Gary G. Geuss, Chief Assistant City Attorney, Laurie Rittenberg and James Patrick Nollan, Assistant City Attorneys, for Defendant and Respondent.

**OPINION**

**GRIMES, J.**—Plaintiff and appellant Michael Leslie Productions, Inc., doing business as Ready Golf Centers (Ready Golf), appeals from the judgment of dismissal entered by the trial court following the sustaining of the demurrer of defendant and respondent City of Los Angeles (City) to Ready Golf's original complaint without leave to amend. Ready Golf contends it stated a valid claim entitling it to relief by writ of mandate, and that even if there were defects in its original pleading, the trial court abused its discretion in refusing Ready Golf at least one opportunity to amend. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The City operates seven public golf courses through its department of recreation and parks (Department): two courses at the Sepulveda Golf Complex, two courses at Griffith Park, the Hansen Dam golf course, the Rancho Park golf course, and the Woodley Lakes golf course. Almost 500 golf carts, on average, are in operation at the City's golf courses on any given day. In 2007, the golf cart concession at the City's golf courses was handled by a private entity, J.H. Kishi Company (Kishi). Kishi had operated the concession for a number of years under a written contract with the City, but that contract expired in 2003, and Kishi continued to operate the concession thereafter on a month-to-month basis.

In July 2007, the Department issued a request for proposal, inviting private entities to submit bids to contract with the City for the golf cart concession at all seven golf courses. The request for proposal included notice to proposed bidders that the Department would also conduct an analysis in accordance with section 1022 of the City Charter to determine whether it was more economical or feasible for the City to "self-operate" the golf cart concession. The results of the analysis and plan for self-operation would be evaluated with the proposed bids received from private entities.

The request for proposal also gave notice that the board of recreation and park commissioners (Board) was the "contract awarding authority" for the Department and would, at a public meeting, select the bidder to be awarded the contract. The "selected concessionaire" would then complete final paperwork and execute the contract directly with the City. Proposed bidders were also given notice that section 10.5 of the City Administrative Code required the proposed contract to be approved by the City Council because the term of the proposed concession exceeded three years. And, proposed bidders were further advised that under section 371 of the City Charter, the City reserved the right to reject any and all bids or proposals and waive any informalities in any bid received if to do so was to the advantage of the City.

In response to the request for proposal, the Department received five bids. Two of those bids were rejected during the initial review for noncompliance with the required bid documentation set forth in the request for proposal. The bids from Ready Golf, Kishi and a third entity, Angeles Management Services, proceeded to the next stage of the evaluation process.

To assist in administering the request for proposal, the Department hired Economic Research Associates, an independent consultant. Economic Research Associates selected a five-person panel composed of individuals from other municipalities experienced in public golf course management. The independent panel interviewed the three proposed bidders and evaluated their respective bids using scoring criteria for six different categories, including (1) ability to finance, (2) qualifications and background, (3) description of proposed golf carts, cart maintenance and cart replacement, (4) business plan, (5) proposed rental payment to City, and (6) capital improvements. Each bidder was evaluated and ranked in each category, with a perfect score being 100. Ready Golf received the highest overall score of 97 points. Kishi was second with a score of 88, and Angeles Management Services was ranked third with a score of 83.2.

The panel unanimously recommended that Ready Golf be awarded the contract. Economic Research Associates concurred with the panel's assessment and forwarded the recommendation to the Department. In May 2008,

John Mukri, general manager of the Department, prepared a report for consideration by the Board, summarizing the evaluation process and recommending that Ready Golf be awarded the contract. Mr. Mukri also reported that the Department's analysis under section 1022 of the City Charter showed it was more economical to award the contract to Ready Golf than for the City to attempt to self-operate the golf cart concession.

At its June 4, 2008 meeting, the Board voted unanimously to award the contract to Ready Golf. The two losing bidders, Kishi and Angeles Management Services, asked the Board to reconsider its decision. At another lengthy public meeting held July 23, 2008, the Board once again voted unanimously to award the contract to Ready Golf.

The proposed contract with Ready Golf contained a provision that the concession would last for 10 years, with one five-year renewal option. Section 10.5 of the City Administrative Code required City Council approval of the proposed contract because it was for a term of more than three years. Pursuant to the mayor's executive directive No. 3, the contract also had to be reviewed by the mayor's office.

Upon receipt of the proposed contract, the mayor's office ordered a report to be prepared by the office of the city administrative officer (CAO). Following its review of the proposed contract with Ready Golf, the CAO issued a report dated October 10, 2008, recommending the City Council approve and authorize the Board to execute the contract, subject to approval as to form by the city attorney in accordance with section 370 of the City Charter.

The CAO report was not released publicly, nor was the proposed contract forwarded to the City Council for a vote. Instead, the mayor's office asked the CAO to review the proposed contract again. In December 2008, after reevaluating the Ready Golf contract, the CAO released its second report, once again recommending that the City Council authorize and approve execution of the proposed contract. The report also concurred in the Department's assessment that it would be more economical for the City to contract with Ready Golf than to self-operate the golf cart concession.

Because Ready Golf had not received notice of the scheduling of a vote on its contract, Ready Golf made numerous inquiries of the mayor's office as to the status of the proposed contract. Ready Golf was told by a representative of the mayor's office that the CAO "got it wrong," but despite several requests, Ready Golf was unable to obtain release of the CAO reports. After continued inquiries by Ready Golf, the mayor's office finally released the CAO reports to the City Clerk in July 2009, and the proposed contract was

forwarded to the Arts, Parks, Health and Aging Committee of the City Council for review in preparation for a vote by the full council.

The committee, headed by Councilmember Tom LaBonge, voted two to zero to approve the proposed contract with Ready Golf. The contract was then placed on the City Council's agenda for a vote on July 22, 2009. During the hearing, a vote on the contract was put on hold on the motion of Councilmember Jan Perry on the grounds that Michael Yamaki, a lawyer for Kishi, was not present. Mr. Yamaki is the nephew of Kishi's principal, as well as a former member of the board of police commissioners and the fire commission, and an adviser to Los Angeles County Sheriff Lee Baca. Mr. Yamaki was also president of the Riviera Country Club and regularly played golf with City officials.

Without any explanation to Ready Golf, the proposed contract was sent back to the Arts, Parks, Health and Aging Committee, whereupon the committee once again voted to approve the contract and to have the matter voted on by the full council. In light of the unexplained delays and procedures, Ready Golf believed Mr. Yamaki was lobbying members of the City Council to vote to reject the Ready Golf contract.

On September 4, 2009, the proposed contract was reset for a vote by the City Council. Several individuals including the president of the Board, and Mr. Mukri, the general manager of the Department, argued for approval of the contract. The City Council was advised that Kishi was being audited for alleged underreporting of revenues to the City and other possible financial irregularities. The City Council voted eight to seven to disapprove the proposed contract with Ready Golf. During that same session, the City Council passed two motions asking the Board to award a five-year contract to Kishi, and asking the Department to study the feasibility of transitioning to self-operation of the golf cart concession at the end of the five-year period.

Kishi was allowed to continue to operate the golf cart concession on a month-to-month basis while the Department undertook an analysis of the City Council's requests. The audit of Kishi was completed in August 2010. The audit confirmed that Kishi had underreported revenues to the City and otherwise questioned Kishi's internal accounting procedures. After issuance of the final audit report, the general manager of the Department issued a third report on the request for proposal of the golf cart concession. Based on a reevaluation of the feasibility of self-operation, the Department came to the revised conclusion that self-operation was the best option, providing a higher rate of return to the City, even as compared with what the Department expected under the Ready Golf bid. The Department further recommended that any further relationship with Kishi be terminated. The Department also

recommended that the request for proposal be cancelled, and that all bidders be sent notices of rejection with deposits returned. Ready Golf received a notice of rejection dated September 7, 2010, along with a return of its bid deposit.

Ready Golf filed this action in November 2010 stating claims for ordinary mandamus and administrative mandamus, and requesting the issuance of a writ of mandate directing the City to submit the proposed contract with Ready Golf to the City Council for a vote and/or compelling the award and execution of the proposed contract with Ready Golf. The City demurred, contending there was no basis for a writ as a matter of law because the City cannot be compelled to exercise its discretion in a particular manner.

After briefing and oral argument, the trial court sustained the City's demurrer without leave to amend and entered a judgment of dismissal on April 20, 2011. This appeal followed.

## DISCUSSION

The central question we must resolve is whether the trial court, in sustaining the City's demurrer without leave to amend, erred in determining that Ready Golf failed as a matter of law to state a claim for traditional mandamus pursuant to Code of Civil Procedure section 1085. Our review of the court's determination of the legal sufficiency of the complaint is de novo. We exercise " 'our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.] . . .' [Citation.]" (*Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598, 606–607 [133 Cal.Rptr.3d 883] (*Westamerica Bank*).)

Our review of the court's decision denying leave to amend is reviewed for abuse of discretion. " 'When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment. [Citations.] . . .' [Citation.]" (*Westamerica Bank, supra,* 201 Cal.App.4th at p. 607.)

We conclude the demurrer was properly sustained and that the trial court did not abuse its discretion in denying leave to amend.

1. *Writ of Mandate (Code Civ. Proc., § 1085).*

■ " 'A public entity's " 'award of a contract, and all of the acts leading up to the award, are legislative in character.' " ' [Citation.]" (*SN Sands Corp. v. City and County of San Francisco* (2008) 167 Cal.App.4th 185, 191 [83 Cal.Rptr.3d 885] (*SN Sands*); accord, *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1253 [15 Cal.Rptr.3d 344].) ■ A traditional writ of mandate pursuant to Code of Civil Procedure section 1085 is a proper remedy for review of a legislative determination. (*Marshall, supra*, at p. 1253; accord, *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [53 Cal.Rptr.2d 355].)

■ Judicial review of such a determination is limited. A traditional writ may issue to compel the performance of a ministerial duty, and "to correct those acts and decisions of administrative agencies which are in violation of law, where no other adequate remedy is provided." (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 329 [109 P.2d 935]; see Code Civ. Proc., § 1085.) "Generally, Code of Civil Procedure section 1085 may only be employed to compel the performance of a duty which is purely ministerial in character. [Citation.] [¶] A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 501–502 [2 Cal.Rptr.2d 50].) "Mandamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner." (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700–701 [128 Cal.Rptr.3d 292]; accord, *Landsborough v. Kelly* (1934) 1 Cal.2d 739, 744 [37 P.2d 93] (*Landsborough*).)

To the extent Ready Golf attempted to plead a cause of action for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5, we find there is no basis, as a matter of law, for stating such a claim because, on the facts pled, the challenged decision was not quasi-judicial in nature. (See *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1399 [52 Cal.Rptr.2d 395] (*Monterey Mechanical*); see also *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 904, fn. 1 [53 Cal.Rptr.2d 389].) Indeed, Ready Golf does not argue on appeal any claim for administrative mandamus. We therefore limit our discussion to the viability of Ready Golf's claim for traditional mandamus.

## 2. *General Law Regarding Charter Cities.*

The City is a charter city with "maximum allowable control over municipal affairs." (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 661 [76 Cal.Rptr.2d 626] (*First Street*).) "The City of Los Angeles shall have all powers possible for a charter City to have under the constitution and laws of this state as fully and completely as though they were specifically enumerated in the Charter, subject only to the limitations contained in the Charter." (City Charter, § 101.)

■ With respect to charter cities, the charter (often referred to as a "local constitution") represents the supreme law of the municipality "subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. [Citation.] In this regard, '[t]he charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. [Citations.]' [Citations.]" (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar*).)

By adopting a charter and " 'accepting the privilege of autonomous rule[,] the city has all powers over municipal affairs, otherwise lawfully exercised, *subject only to the clear and explicit limitations and restrictions contained in the charter.*' [Citations.] Charter provisions are construed in favor of the exercise of the power over municipal affairs and 'against the existence of any limitation or restriction thereon which is not expressly stated in the charter . . . .' [Citations.] Thus, '[r]*estrictions on a charter city's power may not be implied.*' [Citation.]" (*Domar, supra,* 9 Cal.4th at p. 171, italics added; see also Cal. Const., art. XI, § 5.)

■ It is well established that the power to enter into contracts is a municipal affair. (*First Street, supra,* 65 Cal.App.4th at p. 661; *R & A Vending Services, Inc. v. City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1192 [218 Cal.Rptr. 667] [awarding contract for refreshment stands in city park is matter of municipal concern subject to control by city charter].) A charter city "has the power to enter contracts to carry out its necessary functions and may place conditions or specifications on the bidding for such contracts." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1175 [78 Cal.Rptr.3d 572].)

The City's charter expressly provides for the formation of contracts. (See generally City Charter, § 370 et seq.) Section 10.1 of the City Administrative Code provides: "The City of Los Angeles, in addition to any other rights and powers now held by it, or that hereafter may be granted to it under the

constitution or laws of the State, shall have the right and power, subject to the restrictions in the Charter to make contracts." The City has also adopted numerous ordinances enumerating the requirements for the creation of binding City contracts. (See City Admin. Code, div. 10, ch. 1.)

 "[A] charter city may not act in conflict with its charter. [Citations.] Any act that is violative of or not in compliance with the charter is void." (*Domar, supra*, 9 Cal.4th at p. 171.) And, " '[a]ny ordinance passed by a municipal corporation within the scope of the authority expressly conferred on it has the same force within its corporate limits as a statute passed by the Legislature has throughout the state. [Citations.] To be valid, an ordinance must harmonize with the charter. [Citation.] . . .' . . . [¶] '. . . "Where ordinances or bylaws have been enacted pursuant to competent authority they will be supported by every reasonable intendment, and reasonable doubts as to their validity will be resolved in their favor. Courts are bound to uphold municipal ordinances and bylaws unless they manifestly transcend the powers of the enacting body." ' [Citation.]" (*Brown v. City of Berkeley* (1976) 57 Cal.App.3d 223, 231 [129 Cal.Rptr. 1].)

### 3. *The Facts Pled Do Not State a Claim for Writ Relief.*

Ready Golf contends it has properly pled entitlement to writ relief based on the City's alleged violations of, or acts in excess of, its contracting authority as set forth in the charter and applicable ordinances adopted pursuant thereto. First, Ready Golf argues that the City's discretion to reject any and all bids for the golf cart concession pursuant to section 371 of the City Charter was limited by the phrase "when to do so would be to the advantage of the City," and that the City abused its discretion in rejecting Ready Golf. Second, Ready Golf argues that the City Council acted contrary to section 10.5 of the City Administrative Code by passing motions subsequent to its disapproval of the Ready Golf contract, "requesting" the Board to award a five-year contract to Kishi, and in effect illegally modifying the proposed Ready Golf contract. We address each argument in turn.

#### a. *The Right to Reject*

Ready Golf argues the City twice abused its discretionary right to reject: in the City Council's disapproval of the proposed contract on September 4, 2009, and in the Department's notice of rejection of all bids sent in September 2010. The right to reject provision is set forth in section 371 of the charter pertaining to competitive bidding. Subdivision (c) of section 371 provides: "The City shall reserve the right to reject any and all bids or proposals and to waive any informality in the bid or proposal *when to do so would be to the advantage of the City*. The City may also reject the bid or

proposal of any bidder or proposer who has previously failed to timely and satisfactorily perform any contract with the City." (Italics added.)

Ready Golf contends the City's right to reject is qualified by the phrase "when to do so would be to the advantage of the City," and that the record contains no evidence supporting the decision to reject Ready Golf, as it had been unanimously recommended as the best option for the City to operate the golf cart concession. Ready Golf therefore contends it has pled a claim showing the rejection of Ready Golf was without any evidentiary support, was patently arbitrary and an abuse of the discretionary right to reject for which a writ of mandate will lie.

The City argues that the qualifying language applies only to the waiver of informalities and that the City has absolute discretion to reject any or all bids at any time. We agree with Ready Golf's construction of the charter language, finding that the City has the right to reject any and all bids when to do so would be to the advantage of the City. Nonetheless, we do not find that a basis for writ relief has been pled based on an alleged violation of the right to reject provision.

█ A city charter is construed in the same manner as a statute, under the familiar rules of statutory construction. (*Domar, supra,* 9 Cal.4th at pp. 171–172.) The right to reject provision must be read in context, and with reference to the purpose of the entire enactment of which it is a part. (*Ibid.*; accord, *Monterey Mechanical, supra,* 44 Cal.App.4th at pp. 1402–1403.) █ As our Supreme Court has explained, statutes, charters and ordinances pertaining to competitive bidding for public contracts are for the purpose of inviting competition and guarding against fraud and corruption, and must be construed and administered with " 'sole reference to the public interest,' " and *not* the interests of private bidders. (*Domar, supra,* 9 Cal.4th at p. 173.) With this purpose in mind, we find unpersuasive the City's argument that the qualifying language in section 371 of the City Charter ("when to do so would be to the advantage of the City") applies only to the waiver of bid informalities. Rather, the qualification applies both to the right to reject bids and the right to waive any informality in the bid. The question remains, however, whether any facts are alleged showing Ready Golf's entitlement to a writ of mandate based on the manner in which the City exercised its rights under the right to reject provision.

The right to reject provision does not apply to the City Council's decision to disapprove the proposed contract. Ready Golf correctly argued to the trial court that the right to reject provision applies only to the rejection of *bids and proposals* during the bidding process. Ready Golf's bid was *not* rejected during the bidding process. The Board, as the contract-awarding authority for

the Department, selected Ready Golf's bid and proposed to award the contract to Ready Golf. However, because the proposed contract contained a 10-year term, the award was conditional and required the authorization of the City Council to be finalized as a formal contract.

██ Under a separate provision of the City Charter (§ 373 pertaining to long-term contracts in general), and section 10.5 of the City Administrative Code enacted pursuant to section 373, it was *mandatory* to obtain City Council approval of any proposed contract with a term exceeding three years. Without City Council approval, the Board had no power to enter a binding contract with Ready Golf. There is no language in the ordinance qualifying the City Council's authority to approve or disapprove long-term contracts submitted for its consideration. The ordinance provides, in relevant part: "Except as otherwise provided in the Charter or this Code, no board, officer or employee of the City shall make any contract, obligating the City, or any department of the City, to make or receive payments of money or other valuable consideration for a period longer than three (3) years, *unless such contract shall have been first approved by the Council.*" (City Admin. Code, § 10.5, subd. (a), italics added.)

██ In enacting that ordinance, the City plainly made the legislative determination that contracts longer than three years in duration were of sufficient significance that joint approval by the contract-awarding authority and the City Council would be mandatory before any such contract could be finalized and bind the City. This discretionary authority to give or to withhold approval of long-term contracts is vested in the City Council under the City Charter. A writ of mandate will not lie to interfere with that discretionary determination. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 445 [261 Cal.Rptr. 574, 777 P.2d 610] (*Common Cause*).)

However, we find the right to reject provision *does* apply to the Department's subsequent rejection of all bids in September 2010. Ready Golf's petition recited at length the process by which the Department and the Board considered the Ready Golf bid, and the mayor's office and the City Council considered the proposed contract, as well as the various requests for reconsideration, and Kishi's apparent improper influence over the City Council based on its representative's close relationships with City officials. The facts alleged in the petition, and incorporated by reference from the attached exhibits, also show that after the City Council's vote to disapprove the Ready Golf contract, the Department undertook further analysis of the most appropriate option for the golf cart concession, including a reevaluation of the feasibility of self-operation. The Department ultimately concluded that self-operation was the best option and that a better return to the City could be achieved even when compared with the Ready Golf bid, and rejected *all* bids.

■ Construing the complaint liberally, we find it is reasonable to infer that Kishi improperly sought to influence the Board and the City Council by hosting golf outings with City officials or otherwise engaging in behind-the-scenes maneuvers and pulling of strings attached to powerful people in City government. Nonetheless, such facts and inferences do not support a violation of law that may be remedied by traditional mandamus. Ready Golf does not and cannot allege that Kishi's undue influence resulted in an award of a contract to Kishi. The Department reevaluated the feasibility of self-operation and determined to reject all bids, including Kishi's. Courts are not empowered to review the particular manner in which the City exercised its discretion in deciding whether to award the golf cart concession to a private entity or to self-operate. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health, supra*, 197 Cal.App.4th at pp. 700–701; accord, *Landsborough, supra*, 1 Cal.2d at p. 744.)

Under different facts, for example, if the City had acted in violation of clear and explicit limitations and restrictions contained in the charter, Ready Golf may have had the right to seek mandamus. (See *Domar, supra*, 9 Cal.4th at p. 171; see also Cal. Const., art. XI, § 5.) If facts were pled showing the City had violated the contracting requirements of its governing charter, Ready Golf may have stated a claim for writ relief. (See, e.g., *Monterey Mechanical, supra*, 44 Cal.App.4th at pp. 1412–1414 [bidder for public contract was entitled to writ compelling public entity to apply correct criteria specified in Pub. Contract Code to assess good faith effort of bidder to satisfy affirmative action goals]; see also *Landsborough, supra*, 1 Cal.2d at pp. 745–746; *SN Sands, supra*, 167 Cal.App.4th at pp. 193–195.) Or, if facts had been pled showing that Kishi's undue influence had resulted in an award of the contract to it, Ready Golf may have stated a basis to set aside the award due to the tainted process and require the City to reconsider the bids under applicable law.

Or, if all that remained following the Board's award of the proposed contract to Ready Golf were nondiscretionary acts necessary to finalize and execute the contract, a claim may have been stated to compel City action. (See, e.g., *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746 [758, 85 Cal.Rptr.2d 512] [writ of mandate proper to compel execution of approved contract where head of department refused to undertake ministerial act of executing the agreement].) However, the Board's initial award of the contract was conditional on City Council approval. There can be no argument that the City Council's duty under the charter to approve or disapprove a long-term contract was merely a ministerial act. Such a construction would render the approval process mandated by section 373 of the City Charter and section 10.5 of the City Administrative Code superfluous.

 The Board and the City Council's consideration and determination of what would be to the advantage of the City was a classic discretionary function. "It is a legislative function to consider data, opinion, and arguments, and then to exercise discretion guided by considerations of the public welfare." (*Mike Moore's 24-Hour Towing v. City of San Diego, supra,* 45 Cal.App.4th at p. 1312.) "[I]t is well settled that although a court may issue a writ of mandate requiring legislative or executive action to conform to the law, it may not substitute its discretion for that of legislative or executive bodies in matters committed to the discretion of those branches." (*Common Cause, supra,* 49 Cal.3d at p. 445; see *Stanley-Taylor Co. v. Supervisors* (1902) 135 Cal. 486, 488 [67 P. 783] [absent showing of illegal conduct, writ of mandate did not lie to compel public entity to award contract where entity had charter authority to reject all bids in the public interest].)

 We conclude mandamus is not available to Ready Golf to correct any influence of Kishi executives on the City's decision to disapprove the proposed long-term contract or the Board's ultimate decision to reject all bids. In its mandamus petition, Ready Golf sought issuance of a writ of mandate directing the City to submit the proposed contract with Ready Golf to the City Council for a vote and/or compelling the award and execution of the proposed contract with Ready Golf. In its briefs before this court and at oral argument, Ready Golf conceded it is not asking for issuance of a writ compelling the City to award the golf cart concession to Ready Golf, which would plainly exceed the scope of mandamus review. Rather, Ready Golf asks us to vacate the judgment of dismissal and remand for a trial on whether it is to the advantage of the City to reject the Ready Golf bid and to self-operate. Thus, Ready Golf seeks a trial court judgment to the effect that self-operation is not to the advantage of the City, and only an award of the concession to Ready Golf would be to the advantage of the City. Such an order would also exceed the scope of mandamus review.

No matter how distasteful we may find the appearance of bias in favor of Kishi, the courts have no authority to substitute judicial discretion for the City's discretionary decision to self-operate the golf cart concession. There is no legal basis for a writ of mandate in this case based on the City's exercise of the right to reject provision in the City Charter.

### b. *The Alleged Contract Modification*

Section 10.5, subdivision (a) of the City Administrative Code provides that: "Except as otherwise provided in the Charter or this Code, no board, officer or employee of the City shall make any contract, obligating the City, or any department of the City, to make or receive payments of money or other valuable consideration for a period longer than three (3) years, unless such

contract shall have been first approved by the Council. The Council shall have 60 days from the date the contract is transmitted by the board, officer or employee and received by the City Clerk, to approve it. The contract shall be deemed approved if the Council does not disapprove it within this period. *If the Council disapproves the contract, the Council shall not modify the contract, but shall return it to the contracting authority for reconsideration and resubmission to the Council.*" (Italics added.)

After the City Council voted on September 4, 2009, to disapprove the proposed contract with Ready Golf, it passed two motions requesting action by the Board and the Department. It requested that the Board award a shorter term, five-year contract for the golf cart concession to Kishi, and it requested that the Department reevaluate the feasibility of transitioning to self-operation at the end of that five-year period. Ready Golf contends those motions were an illegal modification of the Board-approved proposed contract with it (the only contract before the City Council for consideration), in direct violation of the governing ordinance which commands that "[i]f the Council disapproves the contract, the Council shall not modify the contract, but shall return it to the contracting authority for reconsideration and resubmission to the Council." This language tracks the substantively identical language in the City Charter at section 373.

If the City Council had passed motions *awarding* a five-year contract to Kishi and directing the Board to execute such a contract, then Ready Golf's argument would have merit. However, we cannot imply a restriction into the charter or the ordinance that does not exist. (*Domar, supra,* 9 Cal.4th at p. 171.) There is nothing in the language of section 373 of the City Charter or in section 10.5 of the City Administrative Code that prevents the City Council from asking the Board or Department to consider alternative options following its disapproval of a proposed long-term contract. The City Council asked the Board to consider an alternative contract option with Kishi following its disapproval of the proposed 10-year contract with Ready Golf, a request that admittedly appears unusual given the information in the record that was before the City Council. However, we do not construe the request as a modification of the proposed contract or a violation of the City Charter or the ordinance. Therefore, no claim is stated for issuance of a writ of mandate on this basis.

4. *Leave to Amend.*

Ready Golf has not stated any alternative proposed facts that could be pled that are sufficient to cure the defects in its claim. As such, it was not an abuse of discretion to deny leave to amend. (*Westamerica Bank, supra,* 201 Cal.App.4th at p. 607.)

## DISPOSITION

The judgment of dismissal entered April 20, 2011, in favor of the City of Los Angeles is affirmed. The City of Los Angeles is awarded costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.