Filed 3/20/15  Michael Leslie Productions v. Bd. of Recreation and Park Commissioners CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL LESLIE PRODUCTIONS, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BOARD OF RECREATION AND PARK COMMISSIONERS et al., <br><br> Defendants and Appellants. | B246411 <br><br> (Los Angeles County <br> Super. Ct. No. BC477339) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed and remanded.

Michael N. Feuer, City Attorney, Gregory P. Orland, Managing Deputy City Attorney; and Frederick N. Merkin for Defendants and Appellants.

Roxborough, Pomerance, Nye & Adreani, Drew E. Pomerance and Jason L. Weisberg for Plaintiff and Respondent.

INTRODUCTION

The trial court issued a writ of mandate (Code Civ. Proc., § 1085) ordering respondent the City of Los Angeles (the City), by and through its Board of Recreation and Park Commissioners (the Board), to execute a contract with petitioner Michael Leslie Productions, Inc., doing business as Ready Golf Centers (Ready Golf). In its appeal, the City contends that Ready Golf was not entitled to a writ of mandate because it failed to carry its burden as petitioner to show the occurrence of two conditions precedent to a valid contract under the Los Angeles City Charter (L.A. City Charter) and the Los Angeles Administrative Code. The City also appeals from the ensuing attorney fee award to Ready Golf. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The parties and the concession*

The City operates seven public golf courses. One such course, the Sepulveda Golf Course Complex, is located in Encino on land leased from the United States Army Corps of Engineers (the Army). The contract at issue is for the concession to run the full-service pro shop, satellite range shop, and driving range, and to provide golf lessons at the Sepulveda Golf Course Complex.

Ready Golf operated the concession at the Sepulveda Golf Course Complex under a contract whose term ran from 2001 to 2004. Thereafter, Ready Golf ran the concession on a month-to-month basis (interim contract).

In April 2007, the Department of Recreation and Parks (the Department) issued a request for proposals (RFP) for the concession at the Complex under a 10 year contract, with two five-year options to renew exercisable in the City's sole discretion. The RFP advised all proposers that the contract would be subject to approval by the City Council and by the City Attorney as to form.

2. *The Board's approval*

On February 6, 2008, the Board voted, as reflected in Report No. 08-37, to award the concession to Ready Golf and to approve an agreement "*substantially in the form on file in the Board Office*," subject to final approval by the City Council, the Mayor, the

2

City Attorney as to form, and the Army (the Concession Agreement). (Italics added.) The Board "[a]uthorize[d] the Board President and Secretary to execute the subject agreement upon receipt of the necessary approvals."

The Board also amended Board Report No. 08-37 to "instruct the City Attorney to add a provision to the [Concession Agreement] that would accomplish allowing the parties to continue their discussion and upon a mutual agreement propose an amendment to the Board and to [the City] Council with a suggested time limitation for these discussions of December 31."

3. *Negotiations between the Department and Ready Golf*

Robert Morales, Senior Management Analyst II at the Department and point man for concessions, learned from Assistant City Attorney Mark Brown that the Board had authorized Morales to negotiate the Concession Agreement's terms with Ready Golf. Morales did not understand the amendment to Board Report No. 08-37. He asked Brown who replied that they would discuss the matter later.

By late November 2008, Morales and Ready Golf had negotiated changes to three elements of the Concession Agreement originally proposed by the Board. The parties (1) accepted rent Option I rather than Option II,[1] (2) revised the performance bond from $50,000 to $25,000, and (3) revised the monthly utility payment from $750 to $335. Michael Bernback, Ready Golf's President and primary shareholder, understood from Morales that the Department could freely choose between Option I and Option II, and increase or decrease the performance bond based on economic conditions, without further Board approval. Also, section L.3 of the Concession Agreement allowed the City to adjust the utility fee annually based on the prior year's usage.

---

[1] Rent Option I was based on a percentage of the driving range's gross revenue on a sliding scale between 25 and 60 percent. Option II set rent at 36 percent of the driving range's gross revenue and minimum improvements. The difference between the options was a total of $23,941 out of approximately $2.37 million in rent over the 10 years of the concession agreement's original term.

Morales informed Assistant City Attorney Brown of the revisions. Brown asked Morales to remind him of the revisions when he reviewed the Concession Agreement. In a January 2009 conversation, Morales explained the changes made and promised to send Brown a copy of the Concession Agreement.

Bernback declared that Morales informed him in March 2009 that Assistant City Attorney Brown had approved the Concession Agreement and had given Morales permission to send the final version to the Board and onto the Mayor's office. According to Bernback, Morales explained that he would not have forwarded the Concession Agreement to the Board and to the Mayor's Office had the City Attorney *not approved* the Concession Agreement. On March 13, and again on June 8, 2009, Morales forwarded the Concession Agreement to the Board informing them he had finalized the negotiations with Ready Golf and that the Concession Agreement had been reviewed by the City Attorney.

In April 2009, the Commission Executive Assistant to the Board, Mary E. Alvarez, forwarded the Concession Agreement to the City Attorney requesting that his office review the document. In June 2009, Alvarez transmitted the Concession Agreement to the Mayor and to the Army.

4. *The Mayor and City Council approve the Concession Agreement.*

On November 2, 2009, the City Administrative Officer (CAO) issued its analysis of the Concession Agreement, as required by the Mayor's Executive Directive No. 3.[2] Noting the Board had approved the Concession Agreement on February 6, 2008, the CAO recommended that the Mayor and the City Council give their approvals and authorize the Board President and Secretary to execute the contract.

On November 9, 2009, the Mayor transmitted the Concession Agreement to the City Council for approval. On December 11, 2009, the City Council approved the Concession Agreement, "subject to the approval of the [Army] and the City Attorney."

---

[2] Executive Directive No. 3 requires that contracts over $25,000 in amount and three months in duration, and amendments to such contracts, be submitted for review and approval by the Mayor's Office and possibly a report by the City Administrative Officer.

4

5. *The utilities dispute*

During this period, while Ready Golf was still operating on a month-to-month basis, an issue arose over the correct rate for utilities. Ready Golf had been paying $2,000 per month. In June 2004, the Department acknowledged to Ready Golf that this amount was excessive and that "a 'reduction' " " 'is warranted.' " The Department reduced the monthly utility payment to $750.

In December 2009, the day before the City Council approved the Concession Agreement, the Department notified Ready Golf by letter that the Department owed Ready Golf $62,255.54 in utility overpayments. The letter relieved Ready Golf of the obligation to pay for all utility use as of May 2004 "until such time as the original amount has been restored" to Ready Golf, including interest at the annual rate of 6 percent. The Department attached an amortization table detailing the monthly amounts the City owed and deductions it would make based on the $335 rate negotiated by the Department and Ready Golf. Ready Golf accepted the terms of the Department's December 2009 letter.

6. *The Army approves the Concession Agreement and the Board votes to cancel the RFP*.

Morales informed Ready Golf by letter dated July 1, 2010, that "in anticipation of the signing and execution of the ten-year Concession Agreement," the Department was exercising its first option to renew the term for five years as provided in the Concession Agreement. Ready Golf accepted the option.

In 2011, Ready Golf threatened the City with litigation to force execution of the Concession Agreement. Ready Golf also filed a claim for reimbursement of the utility-bill overpayment.

The Army approved the Concession Agreement in July 2011.

On August 26, 2011, the Department notified Ready Golf that it had received the Army's approval of the Concession Agreement, "*as approved by the Board* of Recreation and Park Commissioners on February 6, 2008 (Board Report No. 08-37) and the . . . City Council on December 14, 2009 (Council File No. 09-2740). [¶] *The Department is prepared to execute the Proposed Agreement* upon the resolution of the outstanding

5

utility issue." (Italics added.) The letter instructed Ready Golf to resume paying the Department $2,000 per month for utilities as specified in the interim contract between the parties, and to repay the Department $174,000 representing the amount incurred for utilities at the monthly rate of $2,000 from May 2004 to July 2011 when the payments were suspended.

In December 2011, the Board met in a closed session to confer with legal counsel about Ready Golf's claim for reimbursement of the utility overpayment and threats of litigation. Thereafter, the Department gave Ready Golf a 30-day notice it was terminating the interim contract.

On April 18, 2012, the Board voted to cancel the RFP and to reject all proposals submitted pursuant to Los Angeles City Charter section 371(c), which allows the City to reject a bid or proposal when it would be to the City's advantage. The Board noted that its staff had misinterpreted the Board's February 6, 2008 direction "and negotiated substantial changes to the proposed contract that were not approved by the Board and varied significantly from the proposal originally submitted by Ready Golf." Continuing, the Board found "[t]he action taken by the Board on February 6, 2008 in the amended Board Report No. 08-37 clearly requires that any amendments to the contract be brought back before the Board for review and approval prior to transmission to the CAO, Mayor, Council and [Army]. The contract submitted for approval to the other entities, was never reviewed nor approved by the Board of Recreation and Park Commissioners and therefore is invalid." (Italics omitted.)

7. *The litigation*

Ready golf filed the instant petition for writ of mandate (Code Civ. Proc., § 1085) and request for declaratory and injunctive relief. Its amended petition alleged that the City had refused to sign the Concession Agreement and instead sought to evict Ready Golf. Ready Golf argued that all required approvals had been obtained and so all conditions precedent had been satisfied, with the result, as the City acknowledged, there remained nothing further to do other than to sign the Agreement. Ready Golf requested

6

that the trial court issue a peremptory writ of mandate commanding the City to exercise its ministerial duty to execute the Concession Agreement.

In its answer to the petition, the City argued that a writ of mandate will not issue to compel the City to exercise its discretion in a particular manner. Execution of the Concession Agreement was not ministerial, it argued, as the Board exercised its discretion to reject all proposals. The City also asserted that the Concession Agreement was void because the City Charter and Administrative Code requirements for contract formation had not been met where the version of the Concession Agreement sent to the City Council was not the same as the version approved by the Board, and where the City Attorney never approved the Concession Agreement.

The trial court issued a peremptory writ of mandate commanding the Board to execute the Concession Agreement. The court also issued an injunction precluding the City from evicting Ready Golf from the Complex pursuant to the interim contract and awarded Ready Golf $217,617.50 in attorney fees (Civ. Code, § 1717). The City appeals from both the writ and the attorney fee award.

## CONTENTIONS

The City contends that the trial court erred in issuing the writ of mandate because two conditions precedent to the City's power to enter into a contract were not satisfied: (1) the City Attorney did not give written approval, and (2) the Board and City Council did not approve identical versions of the Concession Agreement. The City also contends that if we reverse the judgment granting the writ petition, we must reverse the attorney fee award.

## DISCUSSION

1. *Traditional mandate and standard of review*

"A writ of mandate 'may be issued by any court . . . to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office . . . .' (Code Civ. Proc., § 1085, subd. (a).)" (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700.) "There are essentially two prerequisites to issuance of a writ of mandate under Code of Civil Procedure section

7

1085: '(1) the respondent has a clear, present, and usually ministerial duty to act, and (2) the petitioner has a clear, present, and beneficial right to performance of that duty.' [Citation.]" (*Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1413-1414.)

"Generally, mandamus is available to compel a public agency's performance or to correct an agency's abuse of discretion when the action being compelled or corrected is ministerial. [Citation.] 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion . . . is the power conferred on public functionaries to act officially according to the dictates of their own judgment. [Citation.]' [Citations.] Mandamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner. [Citation.]" (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health*, *supra*, 197 Cal.App.4th at pp. 700-701.)

" ' "A public entity's ' " award of a contract, and all of the acts leading up to the award, are legislative in character." ' " [Citation.]' [Citations.] A traditional writ of mandate pursuant to Code of Civil Procedure section 1085 is a proper remedy for review of a legislative determination. [Citations.]' " (*Michael Leslie Productions, Inc. v. City of Los Angeles* (2012) 207 Cal.App.4th 1011, 1020 (*Michael Leslie*).)

On appeal from the trial court's ruling, we determine whether the findings are supported by substantial evidence, and exercise our independent judgment over questions of law when the facts are undisputed. (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289.)

2. *The Los Angeles City Charter governs contracting.*

The relevant law was recently outlined in *Michael Leslie*, *supra*, 207 Cal.App.4th 1011, a case in which Ready Golf sued after the City Council voted to disapprove a contract for a golf-cart concession at the Complex. (*Id*. at p. 1018.) In affirming the judgment of dismissal entered after the trial court sustained the City's demurrer and

8

denied leave to amend (*id.* at p. 1019), the appellate court held, inter alia, that traditional mandate (Code Civ. Proc., § 1085) was not available to Ready Golf to correct the City's discretionary decision not to approve the contract with Ready Golf. (*Michael Leslie*, at p. 1026.) *Michael Leslie* is useful here only because it sets out the general laws concerning charter cities. (*Id.* at p. 1021.)

"The City is a charter city with 'maximum allowable control over municipal affairs.' [Citation.]" (*Michael Leslie*, *supra*, 207 Cal.App.4th at p. 1021.) With respect to contracting, "[i]t is well established that the power to enter into contracts is a municipal affair. [Citations.] A charter city 'has the power to enter contracts to carry out its necessary functions and may place conditions or specifications on the bidding for such contracts.' [Citation.]" (*Ibid.*) "[T]he mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable" (*Los Angeles Dredging Co. v. Long Beach* (1930) 210 Cal. 348, 353.) That is, a contract with the City is not binding unless formed in accordance with the City Charter. (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 671 (*First Street Plaza Partners*).)

Los Angeles City Charter section 370 et seq., described by the City as the mode-is-the-measure principle, authorizes the formation of City contracts. (*Michael Leslie*, *supra*, 207 Cal.App.4th at p. 1021.)[3] The City has also adopted various ordinances specifying requirements for the creation of binding City contracts. (*Id.* at p. 1022, citing L.A. Admin. Code, § 10.1.)[4] Accordingly, the City Charter and Administrative Code require that contracts of the sort involved here be approved by the Board, the City

---

[3] Section 370 of the Los Angeles City Charter states in relevant part: "The City shall not be, and is not, bound by any contract unless it complies with the requirements of this section and all other applicable requirements of the Charter."

[4] Section 10.1 of the Los Angeles Administrative Code states, "The City of Los Angeles, in addition to any other rights and powers now held by it, or that hereafter may be granted to it under the constitution or laws of the State, shall have the right and power, subject to the restrictions in the Charter to make contracts."

9

Attorney as to form, and the City Council. (L.A. City Charter, §§ 271(d), 370, & 373; see also, L.A. Admin. Code, §§ 10.2 & 10.5, subd. (a); see *First Street Plaza Partners*, *supra*, 65 Cal.App.4th at p. 663.)

3. *The Concession Agreement received all of the required approvals.*

The City contends the trial court erred in issuing the writ of mandate here because two pre-requisites to formation of a valid Concession Agreement required by the Los Angeles City Charter and Administrative Code were not met: (a) the City Attorney did not approve the Agreement in writing, and (b) the Board and the City Council did not approve identical versions of the Agreement. Certainly, the decision by any of these entities to approve or disapprove a contract is a discretionary act and a writ of mandate would not lie to interfere with that determination. (*Michael Leslie*, *supra*, 207 Cal.App.4th at p. 1024.) However, if all of the required entities *approve* the contract, then the City's act of executing the contract would be ministerial and subject to a writ of traditional mandate. (See, e.g., *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 758 [when all charter requirements are met, department head may be compelled by traditional mandate to sign contract].)

a. *Substantial evidence supports the trial court's finding that the City Attorney approved the Concession Agreement.*

Section 271(d) of the Los Angeles City Charter provides that "the City Attorney shall *approve in writing the form of all contracts* before the contracts are entered into by or on behalf of the City." (Italics added.) Approval as to form "is tantamount to an approval of the legality of [a contract's] terms." (L.A. City Atty. (Nov. 1, 1963) p. 1.) The City argues that Ready Golf as petitioner failed to carry its burden to show the City Attorney had given written approval of the Concession Agreement. It asserts the absence of written authorization in the record is proof of lack of approval.

Based on the City Charter, Ready Golf had the burden as petitioner to demonstrate that the Concession Agreement was approved by the City Council and by the City Attorney as to form, and consequently that the City had a ministerial duty to sign it. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health*, *supra*,

10

197 Cal.App.4th at p. 700.) Attached to Ready Golf's petition were copies of all of the approvals but that of the City Attorney.[5] However, we conclude the evidence supports the trial court's finding that the City Attorney did approve the Concession Agreement as to form. (*Riverside Sheriff's Assn. v. County of Riverside*, *supra*, 106 Cal.App.4th at p. 1289.)

The evidence Ready Golf submitted in support of its writ petition shows that Morales worked with Assistant City Attorney Brown while he negotiated the Concession Agreement. Morales told Bernback in March 2009 that the City Attorney approved the negotiated Agreement and gave Morales permission to send it to the Board for forwarding to the Mayor. In March 2009, when Morales transmitted the Concession Agreement to the Board, he explained that City Attorney Brown had reviewed it. We reject as unpersuasive the City's suggestion this transmission was only evidence that the City Attorney had reviewed the Agreement, but not that he had approved it. Morales told Bernback *he would not have forwarded the Concession Agreement to the Board had the City Attorney not approved it.* More important, on August 26, 2011, the City notified Ready Golf that the Department had received authorization from the Army of the Concession Agreement, as approved by the Board, and that "[t]*he Department is prepared to execute the Proposed Agreement.*" (Italics added.) The same letter stated that the *only outstanding issue* was the utility bill. Taken as a whole, the evidence submitted by Ready Golf constitutes substantial support for the trial court's finding that Assistant City Attorney Brown reviewed and "did approved [*sic*] the revised version as to form. . . ." Therefore, Ready Golf carried its burden.

The City argues that the trial court improperly shifted the burden to it as respondent to prove the absence of consent by the City Attorney. Not so. Rather, the court rejected the City's showing, stating, "The evidence does not support the City's assertion." The court was not persuaded by Morales' declaration that he could not find

_____

[5]   In addition to the City Charter requirements, Ready Golf carried its burden to show that the Concession Agreement was approved by the Mayor's Office pursuant to Executive Directive No. 3, and by the Army.

11

the City Attorney's approval in his files, noting that Morales at the Board is not the custodian of the City Attorney's files. The court was also understandably struck by the "[c]onspicuous[] absen[ce] from the City's evidence of a declaration from [Assistant City Attorney] Brown." Effectively, the trial court weighed all of the evidence, as it was entitled to do, and found Ready Golf's to be more persuasive. We may not reweigh the evidence. (*Bay Cities Paving & Grading, Inc. v. City of San Leandro* (2014) 223 Cal.App.4th 1181, 1187.) We conclude there was sufficient evidence to support the trial court's findings that the City Attorney had given his oral *approval* as to form.

The City's argument is centered on its assumption that the City Attorney's *written* approval must be given in a separate written document or inscribed on drafts. However, there is nothing in the City Charter or the Administrative Code specifying when in the process before actual execution of a contract the City Attorney must provide a writing. Nor does the record contain any example of a City Attorney approval as to form. Meanwhile, the signature page of the Concession Agreement includes the line, "Approved as to form: [¶] Rockard J. Delgadillo, City Attorney [¶] By: Senior Assistant City Attorney." It is reasonable to conclude that this is where the City Attorney would provide the *written* version of his approval as required by section 271(d) of the City Charter, having already given his authorization orally. This procedure is anticipated by the CAO's and City Council's approvals, which were made "subject to the approval of" the City Attorney.[6] In fact, the City acknowledges that the City Attorney's written approval must appear "*on* the 'contract.' " (Italics added.) The City also concedes the absurdity of requiring the City Attorney to provide his written approval *twice*, during negotiations and at signing. It is furthermore reasonable to conclude that the City Attorney's signature is absent from the Concession Agreement only because the

---

[6]    The City argues that, where the City Council's approval was made "subject to the approval of" the City Attorney, it is not evidence that the City Attorney actually sanctioned the Agreement. We agree. However, as analyzed, there is substantial other evidence to support the trial court's finding that the City Attorney did approve the Concession Agreement as to form.

12

Agreement was never executed. In sum, substantial evidence supports the trial court's finding that the City Attorney orally sanctioned the Concession Agreement, with the result his written approval was simply awaiting execution of the document itself.

b. *The City's contention is unpersuasive that the Concession Agreement is unenforceable because the Board did not approve the final version.*

The City contends that the mode-is-the-measure principle requires that the Board and the City Council approve the "identical proposed contract." It argues that the Board gave its approval in February 2008 before Morales negotiated revisions, whereas the City Council approved the final version. As these two versions were different, the Concession Agreement is not enforceable, the City asserts.

The record reveals chaos, or in the trial court's words negligence, in the Board's handling of the Concession Agreement's negotiations. The City admits that the Board approved a draft Agreement. After negotiations, Morales twice forwarded the Concession Agreement as negotiated to the Board. Rather than to review the revisions, the Board authorized Alvarez to forward the Agreement to the Mayor and City Council for approval and now inappropriately seeks to avoid its responsibility to execute that Agreement by relying on its own omission, notwithstanding that the City had been acting as if all of the approvals had been obtained, and had even exercised its first five-year option. This chaos notwithstanding, we conclude that the trial court did not err in issuing the writ of mandate.

Los Angeles City Charter section 370 and Los Angeles Administrative Code section 10.2[7] specifically state that "The *draft* of the contract *shall* be approved by the

---

[7]     See footnote 3, *ante*.

Section 10.2 of division 10, chapter 1 of the Los Angeles Administrative Code reads in relevant part, "Except as otherwise provided by ordinance, every contract involving consideration reasonably valued at more than One Thousand Dollars ($1,000) shall, except in cases of urgent necessity for the preservation of life, health or property as provided in Section 371(e)(5) of the Charter, be made in writing or other manner as provided by ordinance. The draft of the contract shall be approved by the board, officer or employee authorized to make the contract."

board, officer or employee authorized to make the contract." (Italics added.) The construction to be given a municipal ordinance is a question of law for the court to decide. (*Teachers Management & Inv. Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438, 447.) We rely on the same rules of statutory construction applicable to statutes. (*First Street Plaza Partners, supra*, 65 Cal.App.4th at p. 663.) If the language permits of only one interpretation then "the plain meaning controls and there is no need for construction. [Citations.]" (*Tower Lane Properties v. City of Los Angeles* (2014) 224 Cal.App.4th 262, 269.) The City Charter and Administrative Code here are very clear: They only require the Board to approve the *draft* of the Agreement. A draft is a "tentative, provisional, or preparatory writing out of any document . . . for purposes of discussion and correction, which is afterwards to be prepared in its final form." (Black's Law Dict. (6th ed. 1990) p. 493, col. 2.) The City does not point to any provision in the City Charter or the Administrative Code requiring that the final contract be re-reviewed by the Board in advance of submission to the City Council. By contrast, the provision for City Council approval does not refer to a "draft." (L.A. City Charter, § 373 & L.A. Admin. Code, § 10.5, subd. (a).)[8] The City's assertion to the contrary notwithstanding, necessarily the City Charter and the Administrative Code contemplate that the version the

---

[8] Section 373 states in relevant part: "Except as otherwise provided in the Charter, no board, officer or employee shall make any type of contract, as specified by ordinance, obligating the City or any department to make or receive payments of money or other valuable consideration for a period longer than such period as provided by ordinance, unless such contract shall have been first approved by the Council."

Section 10.5 of the Los Angeles Administrative Code reads, "Except as otherwise provided in the Charter or this Code, no board, officer or employee of the City shall make any contract, obligating the City, or any department of the City, to make or receive payments of money or other valuable consideration for a period longer than three (3) years, unless such contract shall have been first approved by the Council. The Council shall have 60 days from the date the contract is transmitted by the board, officer or employee . . . to approve it. The contract shall be deemed approved if the Council does not disapprove it within this period. If the Council disapproves the contract, the Council shall not modify the contract, but shall return it to the contracting authority for reconsideration and resubmission to the Council." (L.A. Admin. Code, § 10.5, subd. (a).)

Board approves will *not* be the same as the version the Mayor, City Council, Army, and City Attorney eventually authorize, provided the versions do not differ materially.

Here, the Board Report No. 08-37 approved a concession agreement "*substantially in the form* on file in the Board office," subject only to approval by the Mayor, City Council, Army, and by the City Attorney as to form. (Italics added.) Although the Concession Agreement underwent some revision before it was sent to the City Council, the evidence supports the trial court's finding that the changes were not material, with the result that the Board's approval of the draft does not affect the validity of the Concession Agreement that was approved by the other entities. (Cf. *Wilson v. Eddy* (1969) 2 Cal.App.3d 613 [material alterations in language between drafts that were not approved defeats acceptance of contract's terms].) The only differences between the versions that the City raised and substantiated in the trial court were: (1) rent Options I and II; (2) the utilities charge; and (3) reduction in the size of the performance bond. On appeal, the City goes to great lengths to demonstrate what it calls 43 "substantive differences between the Board's and the [City] Council's versions" of the Concession Agreement. The City has forfeited the differences it raises for the first time on appeal. (*In re Marriage of Harris* (2007) 158 Cal.App.4th 430, 439-440.)

Turning to the three revisions considered by the trial court listed above, the evidence supports the court's finding that they were not material. The revision employing rent Option I was authorized by the Board. The CAO's Report to the Mayor explained that "[p]er *the Board's instruction*, Department staff . . . negotiated with [Ready Golf] and determined that [rent] Option I . . . will be more beneficial to the City." (Italics added.) The evidence likewise supports the trial court's conclusion the revision to the utility rate was not material. Under section L.3 of the Concession Agreement, the City reserved the right to adjust the utility fees annually based on prior year's usage. Thus, the Department could freely alter the rate without first obtaining Board approval. Finally, with respect to the revisions reducing the performance bond from $50,000 to $25,000, the change is trivial given this contract is worth approximately $2.37 million in rent over the Concession Agreement's original 10-year term alone. In any event, the

15

CAO's Report never mentioned the performance bond, which omission the court found was evidence of the bond's immateriality.[9]

In sum, the Board was only obligated to approve the draft of the Concession Agreement. The evidence supports the trial court's conclusion that the revisions between the draft and final version of the Agreement proffered by the City were immaterial. Therefore, the Board's approval for those revisions was not required for the Agreement to be valid.

Ready Golf has carried its burden to demonstrate that the Concession Agreement was approved by all of the requisite entities. Therefore, execution of the Agreement, including the signature of the City Attorney, was a ministerial task properly compelled by writ of mandate.[10]

4. *The attorney fee award is affirmed.*

The City separately appeals from the attorney fee award. (Civ. Code, § 1717.) Its sole contention is that the award must be reversed if the judgment granting Ready Golf's petition for writ of mandate is reversed. We do not reverse the judgment granting the petition for writ of mandate. Accordingly, we do not reverse the attorney fee award.

---

[9] We are aware of the amendment to Board Report No. 08-37 to "instruct the City Attorney to add a provision to the contract that would accomplish allowing the parties to continue their discussion and upon a mutual agreement propose an amendment to the Board and to [the City] Council with a suggested time limitation for these discussions of December 31." (Italics added.) Neither Morales nor this court is able to comprehend this paragraph, nor to what provision in the Concession Agreement it refers. However, it appears that this paragraph set December 31 as a deadline for discussing an unspecified provision. Without more, we are unable to conclude that the provision referred to in the paragraph was material.

[10] We have considered and reject the City's remaining arguments involving Evidence Code section 664 and estoppel.

16

DISPOSITION

The judgment issuing the writ of mandate is affirmed. Respondent is to recover costs and attorney fees on appeal. The matter is remanded to the superior court to determine the amount of attorney fees recoverable on appeal by respondent Michael Leslie Productions, Inc.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

KITCHING, J.

17